In the Matter of the Application of NEW YORK STATE GUERNSEY BREEDERS' CO-OPERATIVE, INC., Petitioner, for an Order under Article 78 of the Civil Practice Act Directed against HOLTON V. NOYES, Commissioner of Agriculture and Markets of the State of New York, Respondent.

Fourth Department, June 28, 1940.

*Henry S. Manley,* for the petitioner.

*Milo R. Kniffen* [*Robert I. Millonzi* of counsel], for the respondent.

*Francis L. McElroy*, for *amicus curiæ*.

*Hampton H. Halsey*, for *amicus curiæ*.

*Bond, Schoeneck & King [Edward Schoeneck* of counsel], for *amicus curiæ*.

*Culley & Corbett [Ralph H. Culley* of counsel], for *amicus curiæ*.

McCURN, J. This is a proceeding under article 78 of the Civil Practice Act to review the promulgation by the Commissioner of Agriculture and Markets of the State of New York of a milk marketing order for the so-called Rochester area. The principal features of the order complained of are that it fixes a minimum price and provides for equalization in the Rochester area.

The statutory authority for the marketing order is provided in sections 258-k to 258-m, inclusive, of the Agriculture and Markets Law. The statute with which we are concerned was passed by the 1937 Legislature and became effective May 19, 1937. It is known as the Rogers-Allen Act and was amended in 1939 by the so-called Nunan Act.█ This legislation followed a period of serious difficulty in the milk industry. It was designed to eliminate destructive competition on the part of producers and to prevent unsavory practices on the part of some dealers, to the end that the needs of the consuming public for this essential food be safeguarded, and that the dairy farmer might have a secure market for his milk and receive an equitable share of the price which the consumer ultimately pays.

Those in the milk industry speak of milk as belonging to classes I, II, III, IV, etc. These classifications are not made as to the kind or quality of milk, but as to its uses. Class I, or fluid milk, is milk used on the table. Classes II, III and IV include milk used for ice cream, butter, cheese, etc. Obviously, class I milk, used for food in its original form, commands a greater proportionate retail price and, consequently, a better price for the producers. As a consequence each producer hopes to get his milk into the class I market, even during the flush periods of the year when he has a surplus over and above what he can ordinarily put into the class I market. In order to do so, he cuts the price and crowds out some one else who, in turn, cuts his price, this process being repeated throughout the industry until the whole market is demoralized.

By a declaration of policy, the statutes providing for minimum prices and equalization were designed to end such unhealthy competition and to stabilize prices. (See § 258-k.)

The fault which the petitioner, New York State Guernsey Breeders' Co-operative, Inc., finds with the present order is directed principally at the provisions for equalization. It attacks also, step by step, the procedure followed by the Commissioner and asserts that it is not in accord with the statute. The grounds of criticism will be considered one by one as set forth in petitioner's brief.

*First*, it is claimed that " The petition does not justify equalization." It is argued by petitioner in this proceeding that the petition which initiated the proceedings to promulgate the order complained of does not conform to the statute. A public hearing was had and evidence was offered to prove the conditions referred to in the petition. An officer of the New York State Guernsey Breeders' Co-operative, Inc., was present and gave his testimony. He raised the objection there that the conditions giving rise to the proposed order were not properly pleaded in the petition. He stated that he would not oppose the order if it were merely an order to compel dealers to pay producers the established price without equalization. He objected to the equalization provision of the order. He testified to the conditions upon which he based his objections and presented his arguments therefor.

Thus it can be seen that there was a complete hearing upon all the matters essentially involved in the Commissioner's order. The petitioner here was in no way surprised or misled by the failure to make the original petition more specific as to facts. The petition was a substantial compliance with the statute and at least was not so faulty as to invalidate the order subsequently made.

*Second*, it is claimed that " No testimony given at the public hearing showed that 75 per cent of the producers favored equalization, and the Commissioner did not make his finding upon such testimony."

It is clear from the wording of the statute that the Commissioner must find from the testimony given at the hearing that the conditions, upon which the order is to be based, exist. It would be straining the language used to hold that approval of the proposed order must be obtained from such testimony. It cannot be that the Legislature meant that a producer in order to make his approval or disapproval known to the Commissioner would have to present himself personally as a witness. Such a procedure would be impractical in an area of some 1,900 producers. A properly conducted referendum is more practical and in accord with known methods of ascertaining the will of those concerned.

*Third*, it is claimed that " No separate vote upon equalization was permitted."

We find no provision of the statute for the right to a separate vote on price fixing and equalization. The Commissioner committed no error in submitting the propositions together. The statute indicates that price fixing and equalization are intended to be parts of the same order.

*Fourth,* it is claimed that " The provisions of the order failed to obtain in the referendum the seventy-five per centum favor and approval required by the statute."

It was stipulated that there were about 1,900 producers in the area. A total of 1,463 votes were cast, 1,219 in favor of the order and 244 against. Thus, eighty-three per centum of the votes cast were in favor of the order, equaling sixty-four per centum of the 1,900 producers in the area. The petitioner claims that to authorize the order it was necessary to have the vote of seventy-five per centum of the total 1,900 producers in favor of the order. Many cases are cited in both briefs to support the respective contentions.

*People ex rel. Hetfield* v. *Trustees* (70 N. Y. 28) was a case in which the village of Fort Edward attempted to issue bonds in aid of a railroad. The statute provided " the taxable inhabitants of said village may at such meeting by a majority vote, decide to raise a sum not exceeding twenty thousand dollars for the purpose provided in this act." It also contained the words: " in case a majority of said taxable inhabitants shall vote to raise such sum for said purpose." In that case the voters who voted in favor of the proposal did not constitute a majority of all the taxable inhabitants. The court held (at p. 33): " The statute did not authorize a minority of the taxpayers to determine the question whether a debt should be created under the act. Before this could be done there must have been an affirmative vote of a majority of the taxable inhabitants."

The case of *Smith* v. *Proctor* (130 N. Y. 319) involved authority for raising money to build a school house. The statute read: " whenever a majority of all the inhabitants of any school district entitled to vote, to be ascertained by taking and recording the ayes and noes of such inhabitants attending," etc. It was held that the statute simply required a majority of the qualified voters in attendance. In *Matter of Talbot* v. *Board of Education of City of N. Y.* (171 Misc. 974) it was held that the board could adopt an amended budget only by a majority vote of its seven members and not by a majority of a quorum.

In *Morris* v. *Cashmore* (253 App. Div. 657; affd., 278 N. Y. 730) it was held that a majority of a quorum of the common council could legally act for that body. (See, also, *City of Rome* v. *Whitestown Water Works Co.*, 113 App. Div. 547; affd., 187 N. Y.

542.) Many cases from outside the State are cited in the briefs. They are not decided, so far as we can discern, on any common principle of law, but each is decided upon the basis of the particular statute in question with apparent consideration of the nature of subject-matter involved.

The statute which we have under consideration does not provide specifically for a vote of approval by seventy-five per centum of the producers in the area. It does not expressly provide for a vote or a referendum at all. It reads in part (§ 258-m, subd. 1): " If * * * the Commissioner shall find * * * that it is favored by at least seventy-five per centum of the producers in the production area * * * he may by order fix * * * fair and equitable minimum prices * * *," etc. Subdivision 6 reads: " If approved by seventy-five per centum of the producers affected, any order * * * fixing the price to producers * * * may provide for an equalization * * *," etc.

The Commissioner in this case was required to find if seventy-five per centum favored or approved. The statute gave him no specific instructions as to how he should so find. He decided to take a referendum, as is done under the Federal statute. (See *Hood & Sons* v. *United States*, 307 U. S. 588.) It seems clear from the orders, letters, instructions and copies of documents sent to the producers that all were amply and fairly advised and provided a full opportunity to express their approval or disapproval. The proposed referendum was widely advertised in the newspapers circulated in the area in which such producers reside. All had a full and fair opportunity to vote and about 1,500 out of about 1,900 did vote. Of those who voted eighty-four per centum favored the order. By analogy, in an election to public office qualified electors who fail to vote at an election are presumed to acquiesce in the expressed will of those who do. Such acquiescence may be presumed here. The Commissioner upon the basis of the results of the referendum found that seventy-five per centum of the producers favored the order. We have reached the conclusion that he was entitled to so find and that his finding should not be disturbed.

*Fifth*, it is claimed that " The findings made by the Commissioner are insufficient."

The Commissioner in this case could make the order only if he found " that public interest requires * * * that the public policy declared in section two hundred and fifty-eight-k of this chapter shall be effective and that it is necessary that prices for milk to producers and associations of producers be fixed by the Commissioner * * *," etc. (§ 258-m, subd. 1.) The peti-

tioner in effect says that it is entitled to know upon what factual basis the Commissioner's determination is based, and that is the general rule. (*Matter of Elite Dairy Products* v. *Ten Eyck*, 271 N. Y. 488, 498.)

The Commissioner in the present case should have made findings showing the basic facts upon which he made his decision. (*New York Water Service Corp.* v. *Water P. & C. Comm.*, 283 N. Y. 23.) However, while petitioner complains about the lack of findings, it nowhere claims that conditions referred to in section 258-k did not in fact exist. It is a matter of public knowledge that such conditions have existed for years. Legislative investigations and hearings have followed one after the other and with wide publicity. The propriety of making the order fixing minimum prices is practically conceded. Our attention has not been called to any evidence that the price as fixed was not a proper price. The statute (§ 258-m, subd. 3) provides that the prices fixed or approved by the Commissioner shall be deemed to be reasonable.

The failure to call our attention to any controversy as to the facts which the Commissioner was required to find in order to promulgate the order, forecloses any right to insist that we send the case back for the purpose of making findings of fact. There is some basis in the decision in *Noyes* v. *Erie & Wyoming Farmers Co-op. Corp.* (281 N. Y. 187) for holding that we need not send it back where we are not informed that there is any controversy as to the facts. (See, also, *Pacific States Co.* v. *White*, 296 U. S. 176, at pp. 185, 186.) A hearing was had upon notice and testimony taken, and the attempted findings at least show that the Commissioner considered the evidence and concluded that the conditions required by the statute existed. In the absence of any showing of a controversy as to the existence of the specified conditions we are not required to send the case back for findings.

*Sixth*, it is claimed that " The order was not filed and published within sufficient time to be effective on the date it fixed."

Section 19 of the Agriculture and Markets Law reads in part: " Every such rule or regulation shall take effect twenty days after such filing and after such publication, unless some other date of taking effect shall be prescribed by the Commissioner."

The order was filed November twenty-ninth and by its terms was to become effective December first at twelve-one o'clock A. M. Apparently the Commissioner had the right under the statute to prescribe " some other date," and he did so.

*Seventh*, it is claimed that " The provisions for ' market service payments ' are not those authorized by the statute."

We find no conflict between those provisions of the order and the statute.

*Eighth*, it is claimed that " The provisions for equalization of Guernsey milk are not those intended by the statute."

There are no provisions either in the statute or in the order applying specifically to Guernsey milk. Both apply to all milk. The Guernsey Breeders have consistently claimed that their milk is of a superior quality and that they already had acquired such a preferred position in the market that it is unfair and discriminatory to compel them to equalize Guernsey milk on the same basis as all other milk.

The claims of Guernsey Breeders may be briefly summarized as follows: that Guernsey milk is distinguished by more butterfat, golden color and better flavor which has caused it to be preferred for table use; that during the last seventeen years Guernsey Breeders have conducted an extensive advertising, selling and production program; that they have spent upwards of $300,000 in advertising and that the Golden Guernsey trade-mark has become well and favorably known. The sum and substance of their claims is that on account of the superior quality of their milk and the fact that they have spent large sums of money in bringing that superiority to the attention of the public that there is a greater consumers' demand for Golden Guernsey milk than for other milk. The result is that in the competition for the class I market Golden Guernsey milk was in a favored position; that under competitive conditions it was able to place a greater percentage of its production in the class I market than producers of other milk. Consequently, its blended price was greater per hundred weight than that of other milk, but if compelled to equalize with other milk, this advantage will be lost. Guernsey Breeders say that the Commissioner should have provided for them a " differential " to compensate them for the advantage lost by equalization. They say that the following words in the statute (§ 258-m, subd. 6) empower the Commissioner to do this, viz., " subject to reasonable differentials for quality and location and for services." The respondent Commissioner says he has no authority to grant a differential such as petitioner requests.

The present order provides for an adjustment for butterfat; for every tenth of a point above three and five-tenths per centum of butterfat the producer is to receive an additional four cents for each hundred weight. Thus, if a Guernsey producer delivers milk that tests five per centum of butterfat he will receive sixty cents for each hundred weight more than a producer who delivers three and five-tenths milk. The statute does not authorize the Commissioner to grant the additional differential which the petitioner seeks.

The subject of such additional differential was a matter of controversy before the 1939 Legislature. A proposed bill known as the Seelye Bill (Senate Int. 1048) provided in substance for an order such as the petitioner now asks. The Legislature after a public hearing refused to adopt this bill. Instead they enacted section 258-m, subdivision 6, which reads, in part, that " * * * Such equalization shall include milk of all grades and produced by all breeds of cows * * *."

If we were to send this case back to the Commissioner as requested by the petitioner we would be asking him to put into the order something which the Legislature refused to authorize after a hearing at which we must assume all pertinent facts and claims were presented.

The principle of equalization has been held to be constitutional as applied to the milk situation. (*United States* v. *Rock Royal Co-operative*, 307 U. S. 533, 571, 572; *Noyes* v. *Erie & Wyoming Farmers Co-op. Corp.*, 281 N. Y. 187.)

*Ninth*, it is claimed that " The provisions for equalization of Guernsey milk are so unfair as to be unconstitutional."

The argument under this point rests upon the proposition that, even though the statute be constitutional in a general sense, its application to the present situation of the Guernsey producers goes beyond the original intent and actually results in the taking of petitioner's property without just compensation. It cites *Arverne Bay Construction Co.* v. *Thatcher* (278 N. Y. 222) and *Brock* v. *Superior Court* (12 Cal. [2d] 605; 86 P. [2d] 805).

The prices which are established are minimum and the Guernsey people are in no way limited from getting all they can for their product. They point out, however, that there is a limit to what the public will pay for milk and say that it would probably be futile to try to raise the retail price of Guernsey milk. Guernsey milk contains a greater per centum of butterfat than most other milk. That particular asset is compensated for, however, in the butterfat differential. However, Guernsey producers are injured, according to the petitioner, because the order deprives them of the favorable position which they have enjoyed in competition for the class I market. The petitioner says that the Guernsey producers are entitled to be secured for any advantages gained by their past methods of competition for the class I market. The intent of this legislation, however, is plainly to eliminate competition among producers for the class I market on the ground that such competition results in practices demoralizing to the industry. It attempts to equalize as between those whose methods give them a higher price market and those who as a result must carry the burden of the surplus.

As pointed out above, the equalization scheme has received the approval of our Court of Appeals and of the United States Supreme Court. We can find no facts in the record which tend to place the petitioner in the same position as the plaintiff in *Arverne Bay Construction Co.* v. *Thatcher* (*supra*), cited under this point in petitioner's brief.

The determination of the Commissioner of Agriculture and Markets should be confirmed and the petition of the New York State Guernsey Breeders' Co-operative, Inc., dismissed, without costs.

All concur. Present — CROSBY, P. J., CUNNINGHAM, DOWLING, HARRIS and McCURN, JJ.

Order, in so far as it transfers the proceeding to the Appellate Division, affirmed, without costs. Determination confirmed and petition of the New York State Guernsey Breeders' Co-operative, Inc., dismissed, without costs.