## NEW YORK STATE GUERNSEY BREEDERS' CO-OP., Inc., v. WICKARD, Secretary of Agriculture.

### No. 244.

Circuit Court of Appeals, Second Circuit.

March 30, 1944.

Irving G. Hubbs, of Pulaski, N. Y. (Merritt A. Switzer, of Pulaski, N. Y., on the brief), for plaintiff-appellant.

W. Carroll Hunter, Sp. Asst. to Atty. Gen. (J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., David P. Gordon, Atty., Dept. of Agriculture, of Washington, D. C., Wendell Berge, Asst. Atty. Gen., and Irving J. Higbee, U. S. Atty., of Syracuse, N. Y., on the brief), for defendant-appellee.

Before CHASE, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

For reasons readily understandable, the old controversy as to the relative merits of milk from Guernsey and from Holstein cows has flared up with increased vigor in consequence of the promulgation of federal and state milk orders under legislation designed to secure uniform minimum prices to the milk producers. The Guernsey producers seek either complete exemption from the orders or a substantial differential in their favor—beyond the allowance made all producers for better-than-average butterfat content—based upon asserted superior quality, greater production costs, and increased consumer demand than in the case of average or Holstein milk. Other producers oppose such a differential, and the administrative agencies have refused it. In the extensive court proceedings which have resulted, the Guernsey producers have had an occasional temporary success, as in an early ruling in this proceeding and in certain state rulings—all limited in ultimate decision, however, to orders of remand to the administrative agencies for further or other findings. Now this appeal brings up a final judgment of the District Court refusing to disturb the decision of the Secretary of Agriculture against the Guernsey contention, which decision is vigorously attacked as unsupported in law or fact and as unconstitutionally discriminatory.

The milk order in question is Order No. 27, regulating the handling of milk in the New York metropolitan marketing area, originally issued by the Secretary of Agriculture on August 5, 1938, under the Agricultural Marketing Agreement Act of 1937, § 8c, 7 U.S.C.A. § 608c.[1] Various features of this order have been upheld by us in Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97; Queensboro Farms Products, Inc., v. Wickard, 2 Cir., 137 F.2d 969; and United States v. Adler's Creamery, 2 Cir., 107 F.2d 987; Id., 2 Cir., 110 F.2d 482, certiorari denied 311 U.S. 657, 61 S.Ct. 12, 85 L.Ed. 421, and its constitutionality was sustained in United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. The plaintiff, a co-operative association of producers engaged in the handling of Guernsey milk,[2] first applied for exemption from the order on October 20, 1938, when it filed a petition for review with the Secretary, as provided in the Act, § 8c(15) (A), 7 U.S.C.A. § 608c(15) (A). This the Secretary denied January 3, 1939, in a ruling containing detailed findings of fact and conclusions. Plaintiff then brought this action, seeking review of the Secretary's ruling, as provided in the Act, § 8c(15) (B), and also an injunction against the Secretary. A statutory court of three judges held injunctive relief improper and ordered the allegations relative to it stricken and the action continued before a single judge. New York State Guernsey Breeders' Co-op. v. Wallace, D.C.N.D.N.Y., 28 F.Supp. 590.

Thereafter, the Secretary filed his answer, with a counterclaim for affirmative relief, and the action was heard upon cross-motions for judgment. On January 9, 1940, Judge Cooper filed a lengthy opinion, together with findings of fact and conclusions of law, which were largely favorable to the plaintiff in finding superior quality, increased consumer demand, and greater cost of production in Guernsey than in average milk. His decision was, however, to remand the matter to the Secretary "to make new findings of fact and conclusions upon the evidence and to grant or deny plaintiff's proposed findings and conclusions, with the right to make new or additional findings and with the right of each party to submit additional evidence upon proper notice to the other." Then he ordered the plaintiff to make a special deposit in a bank, subject

---

[1] Originally effective Sept. 1, 1938, 3 F.R. 1945, 1957, 2100, 2102, the order was suspended Jan. 31-July 1, 1939, 4 F.R. 1259, 2377, was reissued with amendments Mar. 30, 1940, 5 F.R. 1258, 1585, was again amended Dec. 9, 1940, 5 F.R. 4970, 6 F.R. 1181, June 14, 1941, 6 F.R. 2944, 3160, and Aug. 29, 1941, 6 F.R. 4507, 4964, and was reissued with amendments Mar. 26, 1942, 7 F.R. 2370. See 7 CFR, 1938 Supp., 927.1-927.11a, with Cum.Supp. yearly since that date.

[2] Plaintiff's primary objective is not the sale and handling of milk, but the promotion of the breeding and development of the Guernsey cow; and much of its time and money are spent in publicizing the quality of Guernsey milk under the label "Golden Guernsey."

to the order of the court, of the sums then or thereafter involved in this dispute. Thereafter the Secretary, through an appropriate representative, conducted additional hearings on plaintiff's petition, and on December 27, 1941, issued another ruling, with lengthy recitals, argument, findings of fact, and conclusions against the plaintiff. Plaintiff thereupon, with leave of the court, filed an amended and supplemental complaint in this action seeking review of the second ruling of the Secretary, made by the Secretary's assistant. The Secretary then (Mr. Wickard having been substituted for Mr. Wallace) again answered and counterclaimed for an injunction, and the matter was heard by Judge Bryant on cross-motions for summary judgment. His judgment, the subject of this appeal, upheld the Secretary's ruling as sustained by the evidence and lawful; and it, therefore, dismissed plaintiff's complaint, ordered the amount on deposit paid over to the Market Administrator, and directed the plaintiff to comply with the order.

The statutory provisions requiring the payment of uniform prices to producers, "irrespective of the uses made of such milk by the individual handler," allow certain "adjustments" not here in issue—including one for "location," which has been granted plaintiff, beginning in 1940—and, in addition, the one here pertinent, namely, adjustment for "the grade or quality of the milk delivered." § 8c(5), paragraph (B) (ii), cf. also paragraph (A). Acting under the authority of this statute the Secretary in Order No. 27 established a butterfat differential of four cents per hundredweight for each one-tenth of one per cent above or below the average butterfat test of 3.5 per cent, this being the differential customarily applied in the market for many years before the order. This differential necessarily works to plaintiff's advantage, since Guernsey milk has one of the highest butterfat contents of any of the milks involved.[3] Plaintiff contends, however, that the superior nature of its milk is such that

it should be entitled to further "grade or quality" differentials. Its attack is, therefore, centered upon the Secretary's basic conclusion that "Guernsey milk does not possess such special qualities and elements as to distinguish it from milk generally and as to require the Secretary to accord to it any special recognition other than that which, under the order, he has already accorded."

In considering the legality of the Secretary's action we need to bear in mind not merely the limited character of review accorded in general to the courts over administrative agencies, including the milk marketing agencies, cf. Stark v. Wickard, 64 S.Ct. 559, 571, but also, as we have had occasion to stress before, the fact that Order No. 27 involves a difficult and complicated adjustment of the most extensive character and detail which is more likely to achieve fairness in the greater number of cases than any we can think of or suggest. Waddington Milk Co. v. Wickard, supra, 140 F.2d at page 102. Since its main features have been so often sustained, we should be particularly hesitant to require distinctions between milk produced by different breeds of cows which have been rejected by the Secretary after full and complete hearing of the parties interested and which will certainly hamper the operation of the order if it does not well have stultifying effects on its effective administration far beyond our present power to visualize or foresee. True, plaintiff represents only a very small part of the milk here regulated;[4] but obviously regulations in its particular favor are regulations detrimental to other producers, and they suggest, in turn, the appeal of other special groups for special exceptions. Pressure of such special interests, while both natural and appropriate with respect to the making of the order, is primarily for the Secretary, who must balance all such considerations to the best of his ability; our function is limited to ascertaining whether or not his findings are supported by any substantial evidence

---

3 The Secretary found that the butterfat content of Guernsey milk averaged from 4.5 to 5.0% (thus being about on a par with Jersey and above Ayrshire milk in this respect), while that of Holstein milk averaged only about 3.5%. The original order also contained a premium allowance for Grade A milk, but that became ineffective in 1940 when the New York City authorities withdrew this grade distinction.

4 Of the total dairy cattle population of New York State, about 90% is of Holstein breed, while 3 to 5% is of the Guernsey breed, owned by some 2,000 Guernsey dairy farmers, of whom about 450 are members of the plaintiff. Plaintiff supplies less than 9,000 of the approximately 4,000,000 quarts of milk sold daily in the marketing area of the order.

and his conclusion authorized by law. We are clear that they are.

First, we may refer to certain subordinate contentions made by plaintiff. It says that the Secretary in his second hearing did not obey Judge Cooper's mandate, but went beyond it in making new findings and in not definitely passing upon the proposed findings in plaintiff's favor which were discussed by the judge. This seems to us too narrow a reading of the district judge's order which definitely provided for the taking of additional evidence, and surely implied the finding of additional facts. In any event, the point does not seem to us important or controlling at this time. This is the first review possible of the proceedings; and since our approach differs from Judge Cooper's, there is little occasion for a remand to the Secretary merely to provide at most for more complete grounds for our disagreement. The record is adequate for final disposition of the matter. Plaintiff then objects to certain recitals in the Secretary's ruling of the former hearings and the evidence introduced, made apparently for the general information of readers of the decision; but these were not essential parts of the decision, and we need not stop to pass upon their details or decide immaterial issues as to their complete accuracy. Further, plaintiff asserts that under the Act the allowance of grade and quality differentials is mandatory upon the Secretary, while the Secretary says that the matter is left to "his informed discretion." So far as we can see, this is but an issue of labels. The Act states a governing principle which the Secretary in his quasi-judicial capacity is to apply to the facts he has found to the best of his ability. To that extent, no more, no less, is the statutory principle mandatory. And we review his action under the legal limitations we have stated above. To that review we turn.

In reaching his ultimate conclusion the Secretary considered and rejected each of the factors urged by plaintiff as setting off Guernsey milk in a class by itself. His conclusion is based upon the evidence of experts, as well as others familiar with the business; and although this is attacked in various particulars, its weighing was properly within the Secretary's province. Plaintiff, of course, emphasized the high butterfat content of Guernsey milk; but since the order contains a differential established by the practices of the trade, we think this point has been fully met. Plaintiff asserted greater Vitamin A potency for Guernsey milk, basing its contention particularly on the carotene content of the milk; but we think the evidence justified the conclusion that Guernsey milk "is not greatly, if at all, different in total Vitamin A potency (including convertible carotene)" from other types of milk. The evidence tended to show that the human body converts carotene far less readily than do the laboratory rats upon which plaintiff premised its argument; and hence carotene content in itself would not require a finding of higher Vitamin A potency. The Secretary also found that Guernsey milk, because of its comparatively high butterfat content, was not so suitable for infant feeding as are milks, such as Holstein, with a lower butterfat content; and this, too, was justified by the testimony, and, indeed, was supported, in part at least, by plaintiff's own course of business in undertaking to supply its customers with pure Holstein milk for infant feeding. The Secretary's conclusion that Guernsey milk tasted no better than other milk had the support of even one of plaintiff's experts who admitted he could not differentiate between milks by taste. And there was evidence to justify the Secretary in finding Guernsey only "slightly richer" in sugar, protein, and ash content, and only "somewhat" yellower in color.

But plaintiff strenuously objects to the Secretary's refusal to make findings to the effect that the higher cost of production of Guernsey milk and its greater marketability required special treatment of it. The Secretary, however, held that these factors of themselves did not show a difference in quality or grade, since inferior milk might be accompanied by high production costs, and that, while there was evidence to show that before the order plaintiff had been able to secure a higher-than-average Class I (fluid milk) utilization for the milk of its members, that fact might be due to causes other than quality, such as extensive advertising, superior selling practices, and proximity to fluid milk markets, or, indeed, to the butterfat differential for which allowance had been made. And he held that under the Act only factors affecting quality and grade could be considered, and hence that the required uniform minimum prices could not be varied with the higher cost of production of certain kinds of milk or the greater public demand for them.

 This finally is the ultimate issue in the case—one, of course, of outstanding importance in milk regulation. It seems to us that the Secretary has correctly construed the law, and that production costs or marketability are not in themselves factors to influence minimum milk prices. For such prices it hardly seems pertinent that special allowances should be made for milk more expensively produced, or more extensively and successfully advertised, but not better in quality or grade. In a purely competitive industry factors of this kind may well affect the market price; but when regulation by way of minimum price is substituted by reason of the very disorder of the market and its effect in impairing farmer purchasing power (§ 1, 7 U.S.C.A. § 601), it is not surprising to discover no allowance for them in the governing authority.[5] Plaintiff suggests that the New York State milk orders, made originally as supplementary to the Federal orders, have been differently treated in the state courts. This could not be controlling, in any event; but it must be pointed out that the governing law there is somewhat different, the views of the various judges in New York appear to be quite divided, and as yet there has been no final disposition of the issue.[6] Plaintiff also suggests that the consequence of the order must necessarily be that farmers cannot make as satisfactory a return with Guernsey as with Holstein cows, and that hence in time the use of the Guernsey breed, for which plaintiff has built up so extensive a demand, will decline, if not cease. But this seems to us a natural and perhaps inevitable consequence of regulation of the market. The contrary result would, of course, restrict the development of Holstein cattle; and if the grade and quality of Guernsey milk do not justify the differential, then not only the immediate business, but the ultimate consuming public, will be adversely influenced by the consequence. We are content, therefore, to leave the matter to the disposition of the Secretary on the evidence which, so far as we can see, he has carefully appraised and valued.

 What we have said applies also to the claim of unconstitutional discrimination, and is all we think it necessary here to add to the discussion of constitutionality had in United States v. Rock Royal Co-op., supra, Waddington Milk Co. v. Wickard, supra, and the other cases cited. Since on this record only questions of law were involved, summary judgment was proper. The mandatory injunction against the plaintiff and the order for payment of the impounded funds to the Market Administrator are likewise justified in a final adjudication of the issues.

Judgment affirmed.

---

[5] The declaration of the policy of Congress in § 8c(18), 7 U.S.C.A. § 608c(18), that the *level of prices* should be "such level as will reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand" obviously refers to the general price level for producers, not to differentials among producers.

[6] The New York statute provides, inter alia, for "reasonable differentials for quality and location and for services." Agriculture and Markets Law, Consol.Laws, c. 69, § 258-m, subd. 6. The Appellate Division of the Fourth Department definitely repudiated differentials based on differing costs of production, reciting legislative history in support of its unanimous decision, New York State Guernsey Breeders' Co-op. v. Noyes, 260 App. Div. 139, 21 N.Y.S.2d 347 (affecting the Buffalo district); and the Third Department reached the same result in a 3 to 2 decision, the dissent particularly stressing consumer demand, in New York State Guernsey Breeders Co-op. v. Noyes, 260 App.Div. 240, 22 N.Y.S.2d 132 (affecting the Rochester district). The latter decision was modified in 284 N.Y. 197, 203, 30 N.E.2d 471, 474, for a remand of the case for further findings, in an opinion which relies generally, and without separate consideration or discussion of legislative history, on a "difference in production costs, quality or marketability of milk of one breed of cows from that of other breeds"; on the authority of this case, the former decision (affecting the Buffalo district) was modified in like manner in 285 N.Y. 523, 32 N.E.2d 823. Thereafter the two proceedings were consolidated, and the Commissioner of Agriculture and Markets held further hearings and then filed findings and conclusions, again unfavorable to the petitioner, which were reversed, 3 to 2, with a remand for further and other findings, in 266 App. Div. 462, 43 N.Y.S.2d 603. An appeal from this decision was dismissed, Nov. 18, 1943, for lack of finality of the order. New York State Guernsey Breeders' Co-op. v. DuMond, 291 N.Y. 704, 52 N.E.2d 593.