LEWES DAIRY, INC. and Clifford S. Ott and James M. Faulkner, as individuals, and d/b/a Hollybrook Dairy, a partnership, Plaintiffs,

v.

Orville L. FREEMAN, Defendant.

Civ. A. No. 2353.

United States District Court
D. Delaware.

Nov. 9, 1966.

James M. Tunnell, Jr., Andrew B. Kirkpatrick, Jr., and Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs.

Alexander Greenfeld, U. S. Atty., Wilmington, Del., and Irwin Goldbloom, U. S. Department of Justice, Washington, D. C., for defendant; Joseph A. Walsh, U. S. Department of Agriculture, Washington, D. C., of counsel.

## OPINION

LAYTON, District Judge.

Plaintiff Lewes Dairy et al. ("Lewes") has brought this action to review the validity of a milk marketing order (Order No. 127, currently, renumbered No. 16) promulgated by the defendant, the Secretary of Agriculture, pursuant to 7 U.S.C. § 608c et seq.

The plaintiff has properly exhausted its administrative remedies as provided by 7 U.S.C. § 608c (15) (A).[1] This court has jurisdiction to review the validity of such order. 7 U.S.C. § 608c(15) (B).[2]

Plaintiff and defendant have filed cross motions for summary judgment. Basically, plaintiff complains that the

---

1. (15) (A) "Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law."

2. (15) (B) "The District Courts of the United States in any district in which such handler is an inhabitant, or has his principal place of business, are vested with jurisdiction in equity to review such ruling, * * *"

Secretary's order, as applied to the plaintiff, creates an illegal trade barrier in violation of 7 U.S.C. § 6C8c(5) (G),[3] (hereafter § (5) (G)), as construed by the Supreme Court in Lehigh Valley Cooperative Farmers, Inc. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962). Defendant, on the contrary, contends that the milk order is in accordance with law.

This controversy has been in existence for over five years and in the courts for over three years. Following earlier Department of Agriculture administrative hearings, cross motions for summary judgment were filed in this Court. At that time, on July 1, 1963, this Court held that the milk marketing order in question was invalid as applied to plaintiff, in that it violated § (5) (G), as construed in *Lehigh Valley,* supra.

On appeal, the Third Circuit reversed, United States v. Lewes Dairy, Inc., 337 F.2d 827 (3rd Cir. 1964), ruling that the case should be remanded to the Department of Agriculture because the factual background of the trade barrier issue had not been sufficiently developed in the record to give the Department an opportunity properly to consider the question.[4]

Pursuant to the Court of Appeals decision, additional hearings were held before a Department of Agriculture examiner at which testimony was taken to develop the trade barrier question. On June 20, 1966, the Judicial Officer of the Department of Agriculture, acting for the Secretary of Agriculture, issued a "Decision and Order on Remand." That decision held that the milk marketing order in question did not create an economic trade barrier in violation of § (5) (G), and was, therefore, in accordance with law as applied to Lewes Dairy.

The court action was thereupon reinstituted by Lewes and the instant motions for summary judgment filed.

■ The power of this court in this review proceeding is limited to a determination as to whether the ruling of the Department of Agriculture Judicial Officer is in accordance with law. 7 U.S.C. § 608c(15) (B), supra. This court cannot disturb the findings of the Judicial Officer if they are supported by substantial evidence. New York State Guernsey Breeders' Co-op. v. Wickard, 141 F.2d 805, 808, 153 A.L.R. 1165 (2d Cir. 1944), Ogden Dairy Co. v. Wickard, 157 F.2d 445, 447 (7th Cir. 1946).

At this point in the litigation, the facts are beyond dispute. Originally, the action challenging the validity of Milk Order No. 16 was instituted by Lewes Dairy and Hollybrook Dairy. Hollybrook has since gone out of business, but it remains an interested party to these proceedings, and the decision vis-a-vis Lewes will be determinative of the Hollybrook case.

Lewes Dairy operates one milk processing plant located in Sussex County, Delaware. There it processes milk and resells it in fluid, drinking form to retail stores. Lewes is considered a "handler" of milk products in the terminology of the Act. The dairy farmers from whom it purchases raw milk are termed "producers." The regular source of supply of the milk Lewes processes and sells is from producers in Kent and Sussex Counties, Delaware. Lewes regularly purchases additional milk to supplement its requirements from a "balancing station", which is another handler located in Pennsylvania.

Lewes distributes the greater part of its production in Kent and Sussex Counties. *These two counties are not regulated under any Federal Milk Marketing*

---

3. (5) (G) "No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."

4. The Lehigh Valley case, which delineated the trade barrier concept, had been decided in the interval between the original Department hearings and the District Court proceedings.

*Order.* Lewes ships a part of its production into the eastern shore counties of Maryland. *These counties are within the Upper Chesapeake Bay Milk Marketing area,* the area regulated by Milk Order No. 16.

The actual quantity of milk shipped by Lewes into these Maryland counties is not in dispute. However, what portion of its production this represents is viewed differently by the parties. The Judicial Officer of the Department of Agriculture found as a fact that Lewes ships into Maryland annually between 40 and 61 percent of its receipts of milk from producers. Department of Agriculture, Decision and Order on Remand, Findings of Fact, No. 2, page 2. While this is an accurate statement as far as it goes, it is misleading. The Department chooses to estimate Lewes' delivery into Maryland as a *percentage of only the milk Lewes buys from its producers, the Delaware dairy farmers,* disregarding completely the milk it processes which it purchases from its Pennsylvania balancing station. Taken as a percentage of its entire production, certainly a more meaningful figure, Lewes ships on an annual basis between 35 and 45 percent of its production into Maryland and sells from 55 to 65 percent in Delaware. However, for purposes of this decision, it does not matter very much which percentage figures are used to describe the amount of milk Lewes ships into the milk marketing area.

Since Lewes ships in excess of 10% of its production into Maryland, it is fully regulated under the terms of Milk Order No. 16. The validity of this Order, which covers counties in Maryland on both shores of the Chesapeake Bay, was sustained, in general, in United States v. Mills, 315 F.2d 828 (4th Cir. 1963), cert. den. sub nom. Willow Farms Dairy, Inc. v. Freeman, 374 U.S. 832, 83 S.Ct. 1874, 10 L.Ed.2d 1054 (1963).

The operation of Order No. 16 is fully described in that opinion. In brief, it provides that the sales of fluid milk by a handler within the marketing area (as opposed to the handler's home area of operations) shall determine whether a milk company is to be regulated. The order is written on a plant basis. That is, if a handler has more than one plant, and ships milk from only one plant into the marketing area, it is regulated on that plant alone. Any plant that has 10% or more of its milk shipped into the marketing area is fully regulated (regulated on 100% of its production) under the terms of the order and is termed a "pool plant". If a plant sells less than 10% of its production into the marketing area, it is regulated only on that milk it in fact ships into the area.

Since Lewes sells more than 10% of its production in Maryland and thus is a fully regulated pool plant, it is forced to pay the regulatory charges the order provides on *all the milk it purchases, and not just on that portion of the milk it buys that is later sold in the Maryland marketing area.*

Under Order No. 16, milk is classified according to the use made of it by the handler, and each class is assigned a price for regulatory purposes. Milk processed for consumption in fluid form is characterized as Class I. Milk used to make manufactured products such as butter and cheese is designated as Class II. Class I milk is assigned a higher price than Class II milk. Lewes is predominately a Class I handler.

The Order regulates the sale of milk within its territorial area in several related ways. First, it directs that a "compensatory payment" be made into the market's "Producer-Settlement Fund", administered by the Order's "Market Administrator", upon all milk purchased by one handler from another (such as the milk Lewes purchases from its Pennsylvania "balancing station"). The order also fixes a price known as the "blend price", which is the minimum that must be paid to the producers (farmers) for raw milk. The blend price is, in general, a weighted average of the Class I and Class II prices. Finally, the Order requires a predominately Class I handler, such as Lewes, to make a payment, determined by the difference in prices between the blend price paid and the as-

signed Class I price, into the producer settlement fund. This payment must be made regardless of what competitive conditions have required the handler to pay. Actually, since the inception of this Milk Order, the competitive price for milk in Kent and Sussex Counties, Delaware, has been higher than the Maryland blend price.

The plaintiff objects to the application of Milk Order No. 16 to it insofar as it requires regulatory payments into the Maryland fund on milk sold by it outside the marketing area, i. e., milk purchased for sale in Kent and Sussex Counties, Delaware. Plaintiff argues that the Order thus applied to it on its Delaware sales and not so applied to any of its Delaware competitors, creates the "trade barrier" in violation of § (5) (G), as construed in *Lehigh Valley*, supra.

In the *Lehigh Valley* case, the imposition of certain "compensatory payments" (somewhat different in nature from the compensatory payments required under this Order) was challenged as violative of § (5) (G). The Supreme Court, in upholding the challenge, read into § (5) (G) the trade barrier concept. After carefully reviewing the legislative history of the Agriculture Marketing Act of 1937, and especially § (5) (G), the Court said:

" * * * § 8c(5) (G) was compendiously intended to prevent the Secretary from setting up, under the guise of price-fixing regulation, *any kind of economic trade barriers*, whether relating to milk or its products." 370 U.S. 76, 97, 82 S.Ct. 1168, 1180. (Emphasis added.)

The Court observed, referring to 79 Cong. Rec. 9462, that § (5) (G) was intended to restrain the Secretary of Agriculture from using his powers to impede the free flow of commerce of dairy products or from requiring anything more of milk from out of the market area than that it "comply with the same conditions which the farmers and distributors comply with in that region." Ibid. at 92, 82 S.Ct. at 1177.

Thus, the Court indicated that in devising milk market regulations, the Secretary was empowered to regulate out-of-market milk only to put it into equality with milk produced in the market. The Secretary could not, through his regulations and orders, cause out-of-market milk to bear a higher burden, because this would tend to discourage the introduction of outside milk into the market and thus create a trade barrier.

It is evident that the term "trade barrier" in the context of milk marketing regulations was not narrowly defined in *Lehigh Valley*. It stands for a rather broad concept without a specific set of requirements which must always be met. The important consideration is how the regulation in question operates with respect to the particular handler. If it has the effect of creating a trade barrier as to a particular handler, it is invalid as to that handler. Justice Harlan made this point clear in *Lehigh Valley:*

" * * * With respect to *these petitioners,* however, and with regard to *the regulation here in issue,* we conclude that the action of the Secretary of Agriculture exceeded the powers entrusted to him by Congress." 370 U.S. 76, 99, 82 S.Ct. 1168, 1181. (Emphasis added.)

The Secretary, in his brief and on oral argument before the Court, urged that, notwithstanding *Lehigh Valley* and § (5) (G), the expressed intent of Congress was to apply full regulation to handlers in Lewes' position. The statutory provisions authorizing marketing orders were originally enacted as part of the 1935 amendments to the Agricultural Adjustment Act of 1933. Act of August 24, 1935, c. 641 § 5; 49 Stat. 753. That act also contained certain provisions imposing processing taxes which were invalidated by the Supreme Court in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936).

After the *Butler* decision, Congress became disturbed lest it be interpreted as invalidating the marketing agreement

provisions as well.[5] To make it clear that it had intended that the marketing order sections be separate from the processing tax provisions, Congress expressly affirmed and validated the former by re-enacting them, with certain amendments not relevant here, as part of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq. The 1937 statute contained a provision expressly approving all marketing orders then outstanding. Act of June 3, 1937, c. 296, Sec. 4; 50 Stat. 249.

From this, the Secretary argues that at the time of this express Congressional ratification, every milk marketing order without exception then in effect set minimum prices to be paid by regulated milk companies on milk not shipped into the marketing area. However, insofar as can be ascertained, each and every one of these early milk orders *contained provisions for adjusting the regulatory price on milk sold outside of the marketing area* to the prevailing price in the area where the milk was actually sold.[6] Thus, rather than support the Secretary's case in this regard, it appears, on the contrary, that Congress *approved milk orders which recognized and accommodated the very kind of problem confronting Lewes here.*

The defendant also argues that despite the broad language in *Lehigh Valley,* the instant case is controlled, not by it, but by Titusville Dairy Products Co. v. Brannan, 176 F.2d 332 (3rd Cir. 1949), cert. den. 338 U.S. 905, 70 S.Ct. 307, 94 L.Ed. 557 (1949). That case, it is argued, "squarely decided" the issue before the court here in favor of the Department of Agriculture, in approving full regulation of a handler which shipped only a portion of its milk production into the New York City marketing area.

The defendant's reliance on that case is, it is believed, misplaced. That court's approval of the full regulation in similar circumstances was implicit at best. The basic question before the court was one of definition—whether Titusville was a "handler" within the meaning of Order No. 27. The Third Circuit decided that, since Titusville continued to hold a franchise, or certificate of approval, from the New York Department of Health to sell milk in the metropolitan New York area, and since the milk order provided regulation only on the basis of such approval, Titusville was fully regulated even though it had ceased to ship any milk into the marketing area. The Circuit Court did not hold that full regulation of a handler introducing only a portion of its production to the marketing area was not violative of § (5) (G). It does not appear that § (5) (G) was even considered by the court. In any event, it may be argued with some force that the clear expression of policy by the Supreme Court thirteen years after the *Titusville* decision, had the effect of over-ruling, *sub silentio, Titusville,* to the extent, at least, that the case appeared to approve full regulation of a milk handler introducing only a portion of its production into the marketing area.

This Court is not unmindful of the language in *Lehigh Valley* which indicates that the Supreme Court left open the question of the validity of full regulation of a handler introducing only a portion of its production into the marketing area.[7] This necessitates an examination

---

5. Sen.Rep. No. 565, 75th Cong. 1st Sess., p. 2; H.R.Rep. No. 468, 75th Cong., 1st Sess., p. 2.

6. These old milk marketing orders, which were not made part of the record, are not easily available for inspection. However, plaintiff's attorney was permitted to examine the orders and stated to the Court that they expressly relieved handlers in Lewes' situation from full regulation on milk sold in their own market. The Secretary's attorney was permitted to

produce copies of these orders to refute the plaintiff's statement, but the time granted for this purpose has long since expired. The Court assumes the correctness of plaintiff's statements.

7. "Whether full regulation of the petitioners would be permissible under the Act is a question which we need not reach in this case. If the Secretary chooses to impose such regulation as a consequence of a handler's introducing any milk into a marketing area, the validity of such a

of the record to see whether the facts of this case demonstrate the existence of the kind of barrier contemplated by the *Lehigh Valley* case.

With this in mind, the record of the remanded proceedings before the Secretary's Hearing Examiner has been carefully scrutinized to determine whether there is substantial evidence supporting the Secretary's finding that Order No. 16 does not create a trade barrier. The question here for decision is whether, as to *this plaintiff, this regulation* creates a "trade barrier." The record of the remanded proceedings indicates that rather than there being substantial evidence revealing the absence of a trade barrier, as the Secretary found, nearly all the evidence points to the existence of an illegal trade barrier. The record clearly shows that Lewes is put at a severe competitive disadvantage by the operation of the Secretary's order.

Unchallenged in the record is the fact that Lewes' primary competition is with about 10 other small dairies located in Kent and Sussex Counties, Delaware.[8] It is undisputed that most of the milk which Lewes purchases is from dairy farmers in those counties and that a majority of the milk Lewes sells is to retail stores in the same locality. Lewes competes with the other local handlers both in purchasing the milk from the Delaware farmers and in selling it to the retail stores.

The record indicates that Lewes must pay a price for its milk, set by the forces of supply and demand, which is greater than the "blend price" fixed by the Maryland order (and paid by Maryland handlers to Maryland farmers). In addition to the competitive price Lewes must pay in Delaware, it is required by the terms of the order to pay into the producer-settlement fund a regulatory charge determined by the difference between the Maryland Class I price and the "blend price", *not just on the milk Lewes introduces into the Maryland market area, but also on the milk, representing the major part of its business, which it sells in Delaware.*

None of the dairies with which Lewes is in competition sells more than 10% of its production in the Maryland market. Thus, the competitors of Lewes are regulated only on that proportion of production actually sold in the marketing area, if any, while Lewes is regulated on all of its production.

Lewes, faced with the situation, has attempted to live with it by paying its farmers in Delaware only the lower Maryland "blend" price. However, according to the record which is uncontradicted, its producers soon gave Lewes an ultimatum: pay the higher local competitive price or they would sell their milk to the other dairies. This threat is a real one. Severe drought conditions over the past few years have created a milk shortage in Kent and Sussex Counties, Delaware. The farmers would be able to sell their milk, at the Delaware market price, to other dairies who are Lewes' competitors in Delaware. The farmers eventually agreed to help Lewes by accepting the lower price pending the outcome of these court proceedings. It is

provision would involve considerations different from those now before us. * * *" 370 U.S. 76, 99, 82 S.Ct. 1168, 1181.

8. It is true that some of Lewes' competition comes from handlers other than these 10 small Delaware dairies, which other handlers are *regulated* under milk orders other than Order No. 16 (i. e. milk orders regulating the Philadelphia and Wilmington areas). At the remanded proceedings, the Secretary attempted to introduce into evidence a table purporting to prove that Lewes' primary competition is with the regulated, rather than the local, unregulated, handlers. However, the Department's attorneys refused to permit plaintiffs to examine the underlying data from which the exhibit was prepared, and objected to its admission for this reason. In the Decision and Order on Remand, at page 18, the Department's Judicial Officer ruled that the contents of that exhibit could not be considered. Thus, it is uncontested on the record that plaintiff's primary competition is with the small, unregulated (or partially regulated) handlers located in Kent and Sussex Counties, Delaware.

uncontradicted that in the long run, should Lewes fail to pay the local competitive price, it will lose its sources of production.

The net effect of the Secretary's milk order, if it is allowed to remain in force as currently written, would be either to put Lewes out of business for failure to secure raw milk, or to force it to pay more for its milk than its competitors, which might well have the same end result. By having to pay the local competitive price for milk, and alone having to pay an extra amount into the Maryland producer fund,[9] Lewes is put at a serious competitive disadvantage. This is a penalty Lewes is forced to pay for the single reason that it chooses to sell some of its production in Maryland. Surely, this is the kind of "economic trade barrier" sought to be prohibited by § (5) (G), as construed in *Lehigh Valley*.

The crux of the Secretary's decision below finding that Order No. 16 did not create a trade barrier as to plaintiff (and the "substantial evidence" relied on) is that in the years since the Order has been in effect, the plaintiff's volume of milk distributed has increased substantially. Department of Agriculture, Decision and Order on Remand, Findings of Fact, Nos. 7 and 8, pp. 3 and 4. This is hardly a justification for imposing on Lewes a penalty which its competitors do not bear. Simply because Lewes has been able to live with full regulation for a few years does not warrant continued imposition of an illegal and unjustified penalty. In the first place, it should be noted that an increased volume of production does not necessarily relate to increased, or even continued, levels of profits. Second, Lewes has only been able to purchase its raw milk at the lower "blend" price due to the cooperation and understanding of the Delaware farmers supplying it. As noted previously, once this litigation is finally concluded, Lewes will lose its sources of supply unless it pays the higher Delaware market price.

It is clear that Lewes can avoid full regulation of its milk production by electing to discontinue its sales in Maryland, at least to the extent of reducing them to an amount representing less than 10% of its total production. But this is perhaps the clearest indication of the barrier effect of Milk Order No. 16. As applied to Lewes Dairy, the order either tends to force it to discontinue a large part of its business in Maryland, or continue it under a severe competitive disadvantage.

Such a situation as unfair as this might be justifiable if full regulation of a plant like Lewes were necessary to achieve some higher goal, such as to prevent the disintegration of effective milk marketing regulation. The government puts forth this argument. However, the record indicates that, rather than necessary to achieve any important goal, *the Secretary could just as effectively regulate milk marketing in the area covered by Order No. 16 with partial, rather than full, regulation of Lewes Dairy.*

The testimony of Herbert L. Forest, the Secretary's expert witness at the remanded proceedings, shows this with clarity. Forest is one of the leading experts on Federal milk marketing in the United States. He has been involved with milk marketing since 1934, except for a brief period during World War II. Since 1953, he has been Director of the Dairy Division, Consumer and Marketing Service of the United States Department of Agriculture. He has testified in court as an expert on Federal milk marketing orders.

Mr. Forest stated preliminarily that there were three reasons for requiring full regulation of Lewes Dairy under Order No. 16, even though it might create an economic disadvantage for it. On cross-examination, however, Mr. Forest admitted that these reasons, while having validity in general, *did not apply in the case of Lewes Dairy and Order No. 16.*

9. The extra amounts in question, which have been paid into court each month pending the outcome of this litigation, total over $240,000.00 as of October 19, 1966.

Mr. Forest testified that one reason for full regulation of a handler such as Lewes is that if such handler was not fully regulated, it might have a profit advantage or shelter in its business outside the regulated marketing area that would enable it to compete more effectively within the marketing area. That is, partial regulation would allow a handler to use outside profits to subsidize it within the marketing area. However, Milk Order No. 16 is written on a plant basis rather than on a company basis which permits a profit shelter. Hence, a multiple-plant handler could arrange its production to devote the production of only one of its plants for sales into the regulated market. Under the terms of the order, such a handler would be regulated only on the basis of that one plant. Mr. Forest stated that such a multiple-plant handler could have a profit shelter under the order as written. This underscores the unfairness of Milk Order No. 16 as applied to Lewes. Since Lewes has only one plant, it is regulated on 100% of its production. If it had two buildings, one next door to the other, it could achieve the partial regulation which the Secretary denies to it. It would be unfair to justify full regulation of Lewes for the profit shelter reason, when a handler with more than one plant can operate under such a shelter.

Mr. Forest stated that another reason for requiring full regulation of Lewes is that if such handler were not fully regulated, there would be no effective administrative technique for assuring that the handler paid to its producers the minimum blend price on the milk actually introduced into the marketing area. However, Mr. Forest admitted that either of two alternative administrative techniques suggested by plaintiff's counsel would work just as well to assure payment of the minimum blend price. First, since under the Order as presently written there is no such administrative problem in the case of a multi-plant handler (it must pay the regulatory blend price only on its purchases delivered to its fully regulated plant), a similar technique could be used with a single plant handler. That is, Forest said that the handler could simply designate which of its farmers were to be regarded as supplying the milk the handler ships into the marketing area and be required to pay only to those farmers the regulatory minimum price.

Also, Mr. Forest agreed that an alternative system could be devised which would require the handler to pay to each of its farmers the regulatory price on that percentage of the milk purchased that the handler in turn actually introduced into the marketing area, and permit the handler to pay the local competitive price on the balance of its purchases from each farmer.

Thus, full regulation of Lewes for administrative control reasons is not required. The Secretary's expert witness admitted that at least two other administrative techniques were available to assure proper payment of the minimum blend price on that portion of a partially regulated handler's purchases introduced into the marketing area. Either of these alternative techniques used in connection with partial regulation of Lewes, would obviate the need for the unfairness caused by full regulation.

Mr. Forest stated that a third reason for applying full regulation to a handler such as Lewes is that it is necessary to bring regulatory benefits to farmers who supply milk sold in the regulated marketing area only during periods of peak demand. However, Mr. Forest agreed that this reason is not one that pertains to the Lewes case, a Class I handler, since the reason is based upon the desirability of bringing regulatory benefits to farmers whose milk is devoted to Class II uses in times other than the period of peak demand.

Thus, although the Secretary continues to argue that full regulation of Lewes Dairy is necessary to carry out the overall objectives of the Agriculture Marketing Act, a closer analysis demonstrates that there is not a single valid policy reason for full regulation of Lewes under Milk Order No. 16.

■ Viewing the record as a whole, the Court concludes that, insofar as it concerns Lewes, Milk Order No. 16 is arbitrary, unfair and, most importantly, wholly unnecessary. It constitutes a trade barrier within the purview of the *Lehigh Valley* decision and is consequently unlawful.

Pursuant to 7 U.S.C. § 608c(15) (B) (1),[10] these proceedings are remanded to the Secretary of Agriculture. The Court directs that Milk Order No. 16 be amended so as to cause the plaintiffs herein to be regulated under the terms of said order only as to that portion of its production actually introduced into the Upper Chesapeake Bay marketing area.

10. " * * * If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary wtih directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires. * * * "