401 F.2d 308
 LEWES DAIRY, INC., and Clifford S. Ott, and James M. Faulkner, individually and as co-partner doing business as Hollybrook Dairy, a co-partnership
v.
Orville L. FREEMAN, as Secretary of Agriculture, Appellant.
 No. 16528.
 United States Court of Appeals Third Circuit.
 Argued November 7, 1967.
 Decided September 25, 1968.
 Rehearing Denied November 19, 1968.
 
 COPYRIGHT MATERIAL OMITTED Richard S. Salzman, Civil Div., Appellate Section, U. S. Dept. of Justice, Washington, D. C. (Carl Eardley, Acting Asst. Atty. Gen., Alexander Greenfeld, U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellant.
 Andrew B. Kirkpatrick, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (James M. Tunnell, Jr., Wilmington, Del., on the brief), for appellees.
 Before STALEY, Chief Judge, and KALODNER and FORMAN, Circuit Judges.
 OPINION OF THE COURT
 FORMAN, Circuit Judge.
 
 
 1
 This is the second time the Secretary of Agriculture appeals from an order of the United States District Court for the District of Delaware which held invalid certain minimum pricing provisions of Milk Marketing Order No. 16[1] on the ground that, as applied to Lewes Dairy, Inc.,[2] they created a prohibited "trade barrier". The Order in question, promulgated by the Secretary pursuant to authority granted him by the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 608c, regulates the milk industry in the Upper Chesapeake Bay, Maryland marketing area.
 
 
 2
 In an earlier proceeding, following Department of Agriculture administrative hearings,[3] the District Court held that the Milk Marketing Order in question was invalid as applied to Lewes in that it violated 7 U.S.C. § 608c(5) (G), as construed in Lehigh Valley Cooperative Farmers, Inc. v. United States.[4]
 
 
 3
 On appeal this court reversed the ruling of the District Court and held that the case should be remanded to the Department of Agriculture to give it an opportunity properly to exercise its statutory powers, because the trade barrier issue had not been raised or considered in the administrative proceedings which were held approximately one year prior to the decision in Lehigh Valley.[5]
 
 
 4
 The Judicial Officer, acting for the Secretary, held further hearings on the remand and, in a formal decision, rejected the challenge to the Marketing Order as both unsupported by the record and incorrect in law.[6] Judicial review of this ruling was sought by Lewes, and again the District Court held the Order invalid as creating a trade barrier.[7] On this appeal the Secretary, for the second time, contends that the District Court erred in concluding that the Marketing Order, as applied to Lewes, created a trade barrier.
 
 
 5
 The operation of the Milk Marketing Order and the facts of this case will be briefly summarized since they are at this point "beyond dispute". Under the Order, milk is classified according to the use made of it by milk companies, or "handlers". Thus, milk used in fluid form is Class I, and milk used to manufacture products such as butter and cheese is Class II. The Order establishes a minimum price for each class of milk — the Class I fluid price being higher than the Class II price.
 
 
 6
 These established prices reflect those which would usually be paid for milk depending on use value. Because of the price differential in an unregulated market, where the supply of fluid milk is greater than the demands of the fluid milk market, chaotic conditions often resulted among producers each seeking to benefit from the greater use value, and therefore the higher price paid for milk used in fluid form. One of the major purposes of the Agricultural Marketing Agreement Act was to create and maintain an orderly market and, in so doing, assure the dairy farmer an adequate minimum price for the milk he delivered to the handlers regardless of how the milk was later used. To avoid the often destructive competition of the unregulated market, a method was devised whereby handlers are required to pay at least a uniform "blend" price to the producers regardless of the use to which it has been put. To arrive at this blend price, all handlers who receive or distribute milk within the marketing area are required to submit monthly reports to the Market Administrator, listing the quantity of milk they have handled and the use for which it was sold. These reports are tabulated and each month a blend price is established which represents the average of the class prices weighted by the amount of producer milk actually used in each class by all of the handlers regulated under the Order.
 
 
 7
 In promulgating a marketing order the Secretary must consider the supply of milk upon which the market, in this instance, Upper Chesapeake Bay, Maryland, regularly and normally depends. This milk, comprising the "market-wide pool" the Secretary found consisted of that received by plants regularly serving the market area with fluid milk. The regulatory scheme was designed to affect those plants of handlers which have substantial business in the market area. These plants, called "pool plants", are those which utilize at least 50 percent of the milk received from farmer producers as fluid milk and distribute at least 10 percent of those receipts in the form of fluid milk in the marketing area. The Marketing Order places pool plants under "full regulation". This means that the milk company or handler which operates a pool plant must pay producers at least the uniform blend price on all milk received from them irrespective of the uses made of the milk by the handler or the places where it is later distributed.
 
 
 8
 While requiring that the blend price be paid to producers, the Act also recognizes that regulated handlers may make different uses of the fluid milk which they purchase. To make adjustments among the handlers and thereby reflect the class use value of the milk to the handler, a producer settlement fund is established by the Order. Each regulated handler pays into, or draws from this fund the difference between the amount paid to its producers under the uniform blend price and the use value of its milk computed at the established class prices. A handler who distributes most of his milk as Class I fluid milk has a greater use value for the milk than the blend price which he paid for it. He would contribute the difference between the blend price and the class utilization price into the fund. A handler who paid the blend price but used the milk to manufacture products would draw from the fund the difference between the blend price he paid and the lower class utilization price. In this way, each handler ultimately pays a price for the milk he purchases which reflects the use he makes of it. The net result of this regulation is that handlers pay for the milk according to its use value to them while the producer farmers are protected from the perilous competition for the fluid milk market by the automatic allocation to them of the blend price which apportions the profitable fluid milk market and the burdensome surplus market among all the producers that serve the marketing area.
 
 
 9
 Lewes operates one milk processing plant, located in Sussex County, Delaware, from which it distributes fluid milk to retail outlets in the area of Maryland regulated by the Marketing Order in question, and various parts of Delaware which are unregulated by any Marketing Order. The regular source of supply of the milk which Lewes processes and sells is from nine or ten producers, all from Kent and Sussex Counties, Delaware. An additional supply of milk, ranging from 18 to 33 percent of its total annual receipts, is obtained from another handler located in Pennsylvania when it is needed by Lewes to balance or supplement its requirements.
 
 
 10
 The Secretary found that Lewes utilized substantially all of its milk in Class I form and that annually it distributed in the regulated area between 40 and 61 percent of its receipts from farmer producers. Lewes admits that this finding is accurate but argues that when its receipts from all sources are considered it ships on an annual basis, between 35 and 45 percent of its total production into the regulated marketing area and sells the remaining 55 to 65 percent in Delaware. Regardless of which figure is used, the Order imposes full regulation on Lewes since it distributes more than 10 percent of its production in the regulated area.
 
 
 11
 Prior to the effective date of the Order, Lewes paid its producers at the competitive Delaware price which was higher than the uniform blend prices subsequently established under the Order.[8] Because the Order imposes full regulation on it, Lewes contends that its principal competitors, who are unregulated Delaware dairies, enjoy a price advantage. Full regulation requires Lewes, a fluid milk handler, to pay into the producer-settlement fund the blend price — Class I differential on all the milk it processes even though the greater portion of it is distributed in the Delaware market. Thus, it contends, the total cost of the milk it purchases (the price it pays to its producers plus the amount it pays into the fund) is greater than the cost which its unregulated Delaware competitors must pay. Also, Lewes contends that the Delaware producers to whom it pays the blend price will not sell to it at that rate after this litigation, if Lewes is unsuccessful, because they can get a higher price for their milk from the unregulated Delaware handlers.
 
 
 12
 Lewes concedes that as to the milk it distributes in the regulated marketing area it should meet the obligations imposed on it by the Marketing Order and pay the blend price — Class I differential into the producer-settlement fund. But Lewes insists that full regulation, which exacts from it this differential on all milk, including that which never enters the regulated marketing area, in effect, creates an economic trade barrier on its shipments of milk into Maryland in violation of section 8c(5) (G) of the Agricultural Marketing Agreement Act[9] as construed by the Supreme Court in Lehigh Valley.
 
 
 13
 The District Court accepted the argument of Lewes that Lehigh Valley controls the decision in this case. It construed that decision as meaning that full regulation of Lewes constituted an economic trade barrier in violation of section 8c(5) (G) of the Act.
 
 
 14
 Lehigh Valley involved the legality of a "compensatory payment" provision of the New York-New Jersey Milk Marketing Order. Such compensatory payments were assessed against "outside" milk companies, which, because of their limited sales in the marketing area, were not fully regulated and were therefore free to purchase their milk at less than the minimum class prices or blend price. Because the outside handlers could disrupt the regulatory scheme of the Marketing Order by introducing underpriced milk into the market, the Order required them to pay into the producer-settlement fund on all the fluid milk they sold in the market area the difference between the highest fluid and lowest surplus class prices established by the Order. The essence of the plan, as the Supreme Court noted, was the imposition of "special monetary exactions on handlers introducing `outside' milk for fluid consumption into a marketing area in months when there is a substantial surplus of milk on the market."[10]
 
 
 15
 The Court held the plan to be an invalid attempt to effect competitive parity among non-pool and pool handlers and to correct the disruptive impact on the total regulatory scheme caused by the importation of unregulated outside fluid milk. Since the compensatory payment bore no relation to the actual cost of the milk, the effect of the plan, under the particular facts of that case, was to make outside or non-pool milk more expensive and thereby protect local producers and pool handlers in the marketing area from competition with outside fluid milk. The compensatory payment plan in Lehigh Valley constituted an economic trade barrier in violation of section 8c(5) (G) because it prevented outside handlers from competing in the marketing area on equal terms with others doing business therein. The legislative history of section 8c(5) (G) was fully examined by the Court, and it concluded that the intent of that section was to assure that milk and milk products brought into a marketing area from outside the area would not be subject to greater restrictions or limitations than would be applied to milk and milk products within the area.
 
 
 16
 In the instant case, Lewes is not an outside dealer. It is a fully regulated handler associated with the marketing area by virtue of its substantial distribution in the area. The regulations to which it is subject are identical with those imposed upon every other regulated handler doing substantial business in the area. Lewes does not contend that it cannot compete on equal terms within the market area. Its contention that the Order erects a trade barrier is based on the argument that, because of the payments it is required to make into the producer-settlement fund on the milk which it distributes in Delaware outside the regulated market area, Lewes finds itself at a disadvantage with respect to the unregulated handlers with whom it competes in Delaware. The effect, it submits, is to discourage it from doing business in the regulated Maryland area.
 
 
 17
 In Lehigh Valley the Court did not consider the difficulties encountered by a regulated handler doing business in an unregulated area. In fact the Court expressly declined to consider whether section 8c(5) (G) prohibits full regulation. It stated:
 
 
 18
 "Whether full regulation of the petitioners would be permissible under the Act is a question which we need not reach in this case. If the Secretary chooses to impose such regulation as a consequence of a handler's introducing any milk into a marketing area, the validity of such a provision would involve considerations different from those now before us."[11]
 
 
 19
 The Supreme Court, in Lehigh Valley overturned a system of "compensatory payments" because, as it said therein, "with respect to these petitioners" the payments demanded effected a trade barrier to the introduction into the market area of "outside" milk. The Court did not strike down all compensatory payments, rather it found that the particular rate of payment involved therein was invalid.[12]
 
 
 20
 In Sterling Davis Dairy v. Freeman,[13] the plaintiffs therein relied on the rule of Lehigh Valley in their effort to show the discriminatory and illegal effect of the regulation which they challenged. The court, however, rejected their application of Lehigh Valley because they had not demonstrated the discriminatory effect of the challenged regulation as had been done in Lehigh Valley. It stated:
 
 
 21
 "It is to be noted that the crux of the Lehigh ruling rests in the actual discriminatory nature of the rates demanded of non-pool handlers introducing `outside' area milk."[14]
 
 
 22
 The petitioners in Lehigh Valley introduced specific rates and prices to support their contention that the Order, as applied to them, was discriminatory. As an example, they showed that the regulation required one of the petitioning handlers to pay $9.18 per hundredweight for the milk introduced into the marketing area, while the pool plant handlers were paying only $6.23 per hundred-weight for distributing the same type of milk in the market.[15]
 
 
 23
 It was for the very purpose of affording Lewes an opportunity to adduce evidence to demonstrate the trade barrier effect of the Marketing Order that this court remanded the matter for further administrative procedure. At the administrative hearing on remand, Lewes offered only one witness, its treasurer. He testified that there are between 500 and 600 farmer producers in the area of Delaware where Lewes buys its milk and all but 100 sell their milk to handlers who are regulated by other federal milk marketing orders. He named several local unregulated Delaware handlers with whom Lewes competes in buying milk from producers and in selling it as bottled milk. Although the witness asserted that the prices paid by competitors were lower than those which the Order forced Lewes to pay, he failed to testify as to prices paid by other milk companies and no other evidence was offered by Lewes on this crucial point. In this situation, it cannot be said that the proof offered by Lewes demonstrated the specific discriminatory effect of the challenged regulation as was disclosed in Lehigh Valley.
 
 
 24
 The Secretary relied on the decision of this court in Titusville Dairy Products Co. v. Brannan[16] to support the proposition that a milk marketing order may subject a handler who does only part of his business in the marketing area to the pricing requirements of the order on all of his producer milk purchases, including those not intended for distribution in the marketing area. In that case, this court ruled that a Pennsylvania milk company was a fully regulated handler under the order regulating the handling of milk in the New York metropolitan marketing area because it had a permit from the New York City Health Department to sell milk there as required by the marketing order. Hence it was subject to the minimum pricing provision of that order on all of its producer milk receipts even though during part of the period in question it distributed no milk in the marketing area. Lewes contends, and the District Court held, that the Supreme Court in Lehigh Valley overruled sub silentio Titusville to the extent that it approved full regulation of a handler introducing only a portion of its production into the marketing area. It is true, as the District Court noted, that in Titusville the effect of section 8c(5) (G) on full regulation was not discussed. For that reason Titusville does not furnish the support claimed by the Secretary. However, in light of the Supreme Court's declination to consider whether full regulation is permissible under the Act, it cannot be said that Lehigh Valley overruled sub silentio Titusville.
 
 
 25
 As the Supreme Court demonstrated in Lehigh Valley, section 8c(5) (G) evolved out of the Congressional intent to restrain the Secretary from imposing regulations which would burden the free flow of milk and its products in commerce. It was designed to insure that no regulation would be promulgated placing a greater burden on outside milk and milk products entering the market than was placed on milk and its products within the market. Thus the Secretary in his efforts to protect a particular market may require no more than equal treatment of pool and non-pool milk. Full regulation is not an attempt to keep milk out of the market or a means of placing a greater burden on outside milk entering the market. In fact, it is a means of insuring equality among all handlers operating pool plants which regularly and normally supply the market with fluid milk purchased from producers. Unlike the particular compensatory payment which was involved in Lehigh Valley, full regulation in this case can not be characterized as an attempt to protect those doing business in the market, at the expense of those outsiders seeking to enter the market. Therefore, there is nothing in Lehigh Valley which inherently invalidates full regulation. Hence, we cannot agree with the District Court's analysis of Lehigh Valley that full regulation, as applied to Lewes is "Surely, * * * the kind of `economic trade barrier' sought to be prohibited by § (5) (G), as construed in Lehigh Valley."[17]
 
 
 26
 Moreover, we are persuaded, for other reasons, that the District Court was not justified in overturning the Secretary's decision. The power of the District Court in reviewing the decision of the Secretary, following his adjudicatory hearing,[18] is not a de novo fact finding process. It is limited to a determination whether the rulings of the Secretary are in accordance with law and his findings are supported by substantial evidence.[19] If they are, they may not be disturbed. Because there attaches to the determination of an administrative agency a presumption of the existence of facts justifying the determination, the burden of proof falls on the party challenging the validity of the agency's ruling.[20] Applying these standards to the present appeal, it was incumbent on Lewes to demonstrate at the administrative hearing the existence of the alleged trade barrier by showing that it paid more for its milk than its unregulated Delaware competitors. Unless these competitors do in fact enjoy a price advantage, it cannot be said that Lewes suffers an economic burden caused by the Order. The only evidence Lewes offered on the point was the testimony of its treasurer which has been heretofore recounted. It fell far short of the required specific showing.
 
 
 27
 On the other hand the Department of Agriculture went forward by offering evidence compiled from records submitted by Lewes itself which indicated that Lewes's milk business had grown steadily and in fact increased substantially since the inception of the contested Order.[21] This evidence disclosed that Lewes's Class I sales of fluid milk in Delaware, outside the marketing area, increased from approximately 3.0 million pounds in 1960 to approximately 3.4, 3.8, 3.8 and 4.6 million pounds in 1961, 1962, 1963 and 1964 respectively. At the same time that Lewes increased by more than 50 percent its milk distribution in Delaware, the area where it allegedly experiences the competitive disadvantages, it also managed to increase slightly its sales volume within the regulated marketing area. The figures concerning Lewes purchases from farmer producers also indicate that it has substantially increased such receipts from a total of approximately 3.6 million pounds in 1960 to a total of approximately 4.17, 4.49, 4.96 and 4.93 million pounds in 1961, 1962, 1963, and 1964 respectively.[22] The Secretary noted that these figures do not picture a regulated handler who cannot compete in the sale of fluid milk in an unregulated area, or a regulated handler who cannot compete in the procurement of milk with unregulated dealers.
 
 
 28
 The District Court, however, found vulnerable the evidence of Lewes's markedly increased business, including both its producer receipts and sales in Delaware. These, it stated, were not indicative of increased or even continued levels of profit and were made possible by producers acceptance from Lewes of the lower blend price only during the pendency of this litigation. Lewes's evidence with regard to the profitableness of its business was totally lacking, and if it sought to prove the discriminatory effect of full regulation through diminishing profit, it had the burden and not the Secretary. As to purchase arrangements with its suppliers, Lewes relied solely on the testimony of its treasurer. The Secretary declined to give the uncorroborated testimony offered by Lewes the credence with which the District Court vested it. In this respect the Secretary acted well within his province of weighing the evidence and the District Court was without power to overrule him absent clear evidence to the contrary. In the circumstances, the Secretary can hardly be faulted for concluding that:
 
 
 29
 "[Lewes] has failed to sustain its burden of proof herein, that is, [Lewes] has failed to establish an unlawful `trade barrier' by reason of the contested order and, in fact, has not even proved any competitive disadvantage by virtue thereof in connection with its operations in Delaware, as distinguished from its mere allegations of such disadvantage."
 
 
 30
 Reviewing the record of the administrative proceedings, it is clear that the Secretary's findings were supported by substantial evidence and that Lewes's trade barrier assertion remained a mere abstraction without evidentiary support. Although the District Court recognized the correct standard in reviewing the decision of the Secretary, it erred in the application of that standard. The role of the District Court is quite narrow; it must assure itself that the petitioning party has been accorded due process in the administrative proceedings. In so doing, the administrative record is reviewed to determine whether the decision rendered therefrom is supported by substantial evidence. The District Court is not free to draw its own independent inferences and conclusions from the record. Yet this is precisely what was done in the instant case. Lewes's challenge to the validity of the Order rests primarily on the assertion that it is unable to meet competition from unregulated handlers in Delaware in the acquisition and sale of milk. The Secretary concluded that:
 
 
 31
 "[Lewes] offered no evidence as to the prices paid or other costs incurred by its competitors, and there is accordingly no basis upon which we can compare costs or conclude that [Lewes's] costs are greater, as asserted by its witness."
 
 
 32
 The District Court rejected the Secretary's conclusion and arrived at an opposite result with the statement: "The record clearly shows that Lewes is put at a severe competitive disadvantage by the operation of the Secretary's order."[23] Its finding was based on what amounted to an abstract assertion by Lewes that the operation of the Order created an alleged economic trade barrier to its competitive position in the unregulated Delaware area. In overturning the Secretary's decision the District Court exceeded its function in a review proceeding. Contrary to the determination of the District Court, we find it clear that the findings and conclusions of the Secretary were adequately substantiated and should not have been disturbed.
 
 
 33
 In fortification of the decision of the Secretary, some further observations are appropriate. In the Agricultural Marketing Agreement Act, Congress gave the Secretary broad discretionary powers to effectuate its purposes. It is his responsibility to determine which handling of milk shall be isolated for the purpose of regulation. Section 8c(5) of the Act specifies how the milk handling so selected is to be regulated.[24] Under section 8c(5) (A), only the milk received by regulated handlers is to be classified and only regulated handlers must pay producers delivering milk to them the prices specified in the order. It is clear that section 8c(5) (A) and (B) authorize, in an order issued thereunder, the regulation of a handler's total milk supply from producers, that is, the minimum pricing of all milk received from producers.
 
 
 34
 The Secretary called as his expert witness, Mr. Herbert L. Forest, Director of the Dairy Division, Consumer and Marketing Service of the United States Department of Agriculture, for the purpose of discussing features of the Marketing Order concerning the conditions in the Chesapeake Bay area which made necessary full regulation of all producer milk received at a pool plant at the same class price according to utilization whether sold in the marketing area or outside the marketing area. In substance Mr. Forest testified that elements were taken into consideration in prescribing geographical boundaries of a marketing area, the difficulties in arriving at them, and that inevitably some distributors would be found who sold their milk both inside and outside the area being established; that where a substantial amount of milk was sold by a handler in the marketing area — and generally ten percent or more of the fluid milk the handler received at its plant from farmers was regarded as substantial — the application of the pooling and pricing of a marketing order to all producer milk received at the handler's plant without regard to its ultimate disposition, was administratively necessary; that unless all of the milk received in such a plant was subject to full regulation the marketing order could be rendered ineffective because "open ends" would be left whereby the handler could pay a lower price for milk sold outside the market, reducing the average cost of the handler's total milk supply; that full regulation is intended to prevent a handler from disrupting the regulated market by undercutting its competitors in that market by reason of price advantages it enjoyed outside the market.
 
 
 35
 On cross examination Mr. Forest was asked if Lewes operated two plants, one exclusively in the production of milk for sale in the marketing area and the other plant for the production of milk it sells in the unregulated area, whether he agreed that the second plant would be unregulated and, as the Order is now written, Lewes would be in position to exploit the kind of profit shelter that had been described. He replied in the affirmative. The witness was then asked to consider an operation in one plant where five of ten farmers were designated as producing milk for the outside market and five for the inside market, and whether this would work a solution of the administrative problem to which he also replied in the affirmative. Pressed, on further cross examination, Mr. Forest conceded the workability of other alternatives designed to relieve the handler of paying regulated prices on milk purchased for sale outside the regulated marketing area.
 
 
 36
 The District Court noted that since the Order was written on a plant basis rather than on a company basis it permits a multiple plant handler to devote only one of its plants for sales into the regulated market with regulation attached only to that plant. This it found underscored the unfairness of the Marketing Order in this case to Lewes since it operates only one plant with 100 percent of its production regulated, but if it segregated its sales it could escape regulation on milk sold in the unregulated area as in the instance of multiple plant handler.
 
 
 37
 The District Court found that Mr. Forest "agreed that an alternative system could be devised which would require the handler to pay each of its farmers the regulatory price on that percentage of the milk purchased that the handler in turn actually introduced into the marketing area, and permit the handler to pay the local competitive price on the balance of its purchases from each farmer"[25] and that "at least two other administrative techniques were available to assure proper payment of the minimum blend price on that portion of a partially regulated handler's purchases introduced into the marketing area."[26] The District Court concluded that "Either of these alternative techniques used in connection with partial regulation of Lewes, would obviate the need for the unfairness caused by full regulation."[27] Hence it found no valid policy for full regulation of Lewes under the Order and in so far as Lewes was concerned the Order was unnecessary, unfair and arbitrary.
 
 
 38
 The District Court justified its conclusions by a too literal reading of Mr. Forest's answers interspersed in his lengthy cross examination. It predicated its reasoning that the Marketing Order was unfair to Lewes on the theory that a handler with two plants could render itself exempt from full regulation by selling all the milk it received at one plant in the market area and selling all the production of the other outside the market, while Lewes with a single plant could not so operate. No showing was made that any handler with more than one plant was thereby escaping full regulation and Mr. Forest made it clear that should such circumstances arise they would promptly induce appropriate regulatory measures. The alternative provisions for regulation found to be available to the Secretary were based on answers given by Mr. Forest which were induced by questions suggesting factors afield from the realities and practicalities of the actual conditions sought to be regulated by the Marketing Order. A review of Mr. Forest's entire testimony leads to the conclusion that the admissions noted by the District Court were counterbalanced by his reiterated statements that past experience had taught that the provision for full regulation was required for effective administration.
 
 
 39
 If there are alternatives to the Order as framed we are persuaded, as argued on behalf of the Secretary, that the wisdom of his choice of the alternatives is not cognizable in this proceeding. Only the legality of his choice is in issue here. The fact that regulation may be achieved that is equally as efficacious for the purpose of the Act with less expense to Lewes does not render illegal the application of the Order to Lewes.
 
 
 40
 Other challenges to the validity of this Order prompted the Court of Appeals for the Fourth Circuit to say:
 
 
 41
 "After all, the Secretary must look at the area with a wide and comprehensive perspective. He has before him the entire output of milk in the area, and he must search for the best ways and means for its disposition. Aware of the annual consumption and distribution of fluid milk, he must arrange to channel the residue into outlets the most advantageous to the producer and consumer. He fashions his order accordingly. Of course, there may be some resultant damage to a handler or producer in the enforcement of the Act but this lack of perfection does not destroy the validity of the Order. The constitutionality of the Act is no longer questionable. * * * Absolute equality is not demanded to sustain the operation of the Order. If the Secretary cannot `produce complete equality, for the variables are too numerous', he `fulfills his role when he makes a reasoned' Order. * * *"[28]
 
 
 42
 The foregoing statement is equally cogent in this case.
 
 
 43
 With a view toward these problems, the Secretary, consistent with the declared policy of the Congress,[29] deemed it essential to the stable and orderly function of the market that handlers operating pool plants which have substantial connections with the market should be fully regulated. Full regulation is neither a new nor an unusual regulatory technique. Similar requirements have been imposed by the Secretary as necessary to insure orderly marketing conditions for more than twenty-five years and now obtain in sixty-five other federal milk marketing orders across the nation. Long-lived and widespread usage alone, of course, does not insulate a system from meritorious attack. On the other hand in the administration of so complex an Act by specialists and experts the long standing construction of the statute by the Secretary is entitled to considerable weight at the hands of the courts.[30]
 
 
 44
 The foregoing discussion leads to the conclusion that Lewes has fundamentally failed to prove that its competition in the unregulated market enjoyed an advantage over it which creates an economic trade barrier contemplated by section 8c(5) (G)[31] as treated by the Supreme Court in Lehigh Valley Cooperative Farmers, Inc. v. United States,[32] and we find valid the action of the Secretary in imposing full regulation upon Lewes under Marketing Order No. 16. Hence the judgment of the United States District Court for the District of Delaware of December 12, 1966 will be reversed.
 
 
 
 Notes:
 
 
 [1]
 Originally, this Order, which became fully effective February 1, 1960, was denominated No. 127; it has since been renumbered as No. 16. See 7 C.F.R. Part 1016. Hereinafter, Order No. 16 will be referred to without number
 
 
 [2]
 Technically this appeal involves appellees, Lewes Dairy, Inc., and Clifford S. Ott and James M. Faulkner, doing business as Hollybrook Dairy, a partnership. During the course of this litigation, Hollybrook Dairy was sold and is no longer doing business. Its interest in the proceeding, which relates to certain back payments, has been represented by Lewes Dairy. For convenience the appellees will be referred to hereinafter as Lewes
 
 
 [3]
 Shortly after the Order became effective, its validity was challenged by Lewes and several Maryland milk companies in administrative proceedings. From the ruling therein that the Secretary had lawfully exercised his authority, judicial relief was sought by both the Maryland companies and Lewes in the respective United States District Courts of Maryland and Delaware. In re Mills Dairy Products Co., 20 A.D. 541 (1961). In the Maryland cases, the Court of Appeals for the Fourth Circuit upheld the Order on issues unrelated to those advanced herein by Lewes, reversing the contrary ruling of the District Court of Maryland. United States v. Mills, 315 F.2d 828 (4 Cir. 1963), reversing 206 F.Supp. 239 (D. Md.1962), cert. denied, sub nom., Willow Farms Dairy, Inc. v. Freeman, 374 U.S. 832, 83 S.Ct. 1874, 10 L.Ed.2d 1054 (1963)
 
 
 [4]
 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962)
 
 
 [5]
 United States v. Lewes Dairy, Inc., 337 F.2d 827 (3 Cir. 1964), cert. denied, 379 U.S. 1000, 85 S.Ct. 720, 13 L.Ed.2d 702 (1965)
 
 
 [6]
 In re Lewes Dairy, Inc., 25 A.D. 709 (1966)
 
 
 [7]
 Lewes Dairy, Inc. v. Freeman, 260 F. Supp. 921 (D.Del.1966)
 
 
 [8]
 For some time after February 1, 1960 when the Order became effective, Lewes continued to pay its producers the higher Delaware market price subject to an agreement by the producers to refund to Lewes all amounts in excess of the blend prices if Lewes should be unsuccessful in this litigation. Since February 1963, however, Lewes has paid its producers only the minimum blend price required by the Order. Pursuant to an order of the District Court, all payments due from appellees to the producer-settlement fund have been paid each month into the court's registry pending the outcome of this litigation. As of June 1, 1967, Lewes Dairy has deposited $261,503.66; Hollybrook Dairy has paid $18,236.64 and is charged with owing an additional $45,574.85
 
 
 [9]
 7 U.S.C. § 608c(5) (G):
 "No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."
 
 
 [10]
 370 U.S. at 82, 82 S.Ct. at 1172
 
 
 [11]
 370 U.S. at 99, 82 S.Ct. at 1181
 
 
 [12]
 The Supreme Court intimated inLehigh Valley that a marketing order which invoked a rate of compensatory payments which merely placed non-pool (unregulated) handlers on a par with pool (regulated) handlers would not be a trade barrier. See 370 U.S. at 98 and 87, n. 13, 82 S.Ct. at 1180 and 1174.
 
 
 [13]
 253 F.Supp. 80 (D.N.J.1965)
 
 
 [14]
 Id. at 86
 
 
 [15]
 370 U.S. at 86, 82 S.Ct. at 1174
 
 
 [16]
 176 F.2d 332 (3 Cir.), cert. denied, 338 U.S. 905, 70 S.Ct. 307, 94 L.Ed. 557 (1949)
 
 
 [17]
 260 F.Supp. at 927
 
 
 [18]
 7 U.S.C. § 608c(15) (A) provides:
 "Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law." (Emphasis added.)
 
 
 [19]
 5 U.S.C. § 706. United States v. Mills, 315 F.2d 828 (4 Cir. 1963); Wawa Dairy Farms, Inc. v. Wickard, 149 F.2d 860 (3 Cir. 1945); Queensboro Farm Products, Inc. v. Wickard, 137 F.2d 969 (2 Cir. 1943)
 
 
 [20]
 Windham Creamery, Inc. v. Freeman, 230 F.Supp. 632 (D.N.J.1964); aff'd, 350 F.2d 978 (3 Cir. 1965), cert. denied, 382 U.S. 979, 86 S.Ct. 551, 15 L.Ed.2d 470 (1966); Sterling Davis Dairy v. Freeman, 253 F.Supp. 80 (D.N.J.1965)
 
 
 [21]
 The documentary evidence was compiled for the five years from 1960 to and including 1964, the last year for which complete figures were available at the time of the administrative hearing
 
 
 [22]
 In addition to its purchases from producers, Lewes supplements its milk receipts with purchases from a Pennsylvania handler. These purchases of fluid milk which represented approximately one-fourth of Lewes's total milk purchases during the five year period, were made with minor exceptions, at prices substantially below the blend prices required by the Order. Milk purchased from another handler is not subject to the full regulation provisions to which Lewes objects and until August 1964 such purchases were not subject to any federal or state regulation. Since then, a compensatory payment has been required by the Order with regard to such purchases
 
 
 [23]
 260 F.Supp. at 926
 
 
 [24]
 7 U.S.C. § 608c(5) provides in pertinent part:
 "(5) In the case of milk and its products, orders issued pursuant to this section, shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:
 "(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.
 "(B) Providing:
 "(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them: * * *
 "(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered; * * *."
 
 
 [25]
 260 F.Supp. at 928
 
 
 [26]
 Id
 
 
 [27]
 Id
 
 
 [28]
 United States v. Mills, 315 F.2d 828, 838
 
 
 [29]
 7 U.S.C. § 602
 
 
 [30]
 Ideal Farms, Inc. v. Benson, 288 F.2d 608, 615 (3 Cir. 1961), cert. den., 372 U.S. 965, 83 S.Ct. 1087, 10 L.Ed.2d 128 (1963); Queensboro Farm Products, Inc v. Wickard, 137 F.2d 969, 980-981 (2 Cir. 1943)
 
 
 [31]
 7 U.S.C. § 608c(5) (G)
 
 
 [32]
 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962)