**DAIRYLEA COOPERATIVE, INC.,**
**Plaintiff,**

v.

**Earl L. BUTZ, Secretary of the Department of Agriculture of the United States, Defendant.**

**No. 72 Civ. 4653.**

United States District Court,
S. D. New York.

Nov. 15, 1973.

Botein, Hays, Sklar & Herzberg, New York City, for plaintiff; Sydney C. Winton and Stanley M. Kolber, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., for defendant; Joel Harris, and V. Pamela Davis, Asst. U. S. Attys., of counsel.

ROBERT L. CARTER, District Judge.

## OPINION

### I

Dairylea is a cooperative of dairy producers which serves as a handler for some of the milk produced by its members. It is suing as a representative of its producer-members to challenge the base-excess provisions of an order regulating the handling of milk in the Middle Atlantic Region. In its capacity as a handler, Dairylea is required by the order to pay certain amounts into a pool for the milk which is received from producers; in their capacity as producers, Dairylea members are entitled to receive certain amounts for milk which they sell in the Order 4 Region.

This action was brought to challenge the formula by which the amounts of payments to producers are determined; it raises no issue as to the price which handlers are required to pay into the settlement fund. Section 15A of the Agricultural Marketing Agreement Act of 1937, as amended ("the Act"), 7 U.S. C. §§ 601 et seq., 608c(15)(A), provides an administrative remedy for handlers who are aggrieved by provisions of a marketing order. Despite prior rulings which indicate that the administrative remedy is not available to those who seek to adjudicate producer rights, the agency has indicated in this case its willingness to waive any defense to a Dairylea 15A proceeding on the ground

of lack of standing. There is, however, no case law to support the proposition that the Department has jurisdiction, pursuant to Section 15(A), to hear a complaint which rests upon an allegedly unlawful diminishment of payments to producers. In Inter-State Milk Producers' Cooperative, Inc. v. St. Clair, 314 F.Supp. 108 (D.Md.1970) the court noted, at page 111, that:

> "Whether a district court would have jurisdiction [prior to administrative review] to decide such a question at the suit of one or more producers, and the nature of the relief which might be granted would depend upon whether the ruling in question would diminish the equalization pool. * * * In the instant case the ruling increases rather than diminishes the equalization pool. * * *" [Citations omitted.]

Plaintiff here complains of provisions which reduce payments to certain producers, but do not affect prices paid by handlers. The case is, therefore, analogous to the hypothetical proposed by the Maryland court and district court review should be available without a prior administrative determination.

■ It, therefore, appears that the court has jurisdiction regardless of plaintiff's failure to seek an administrative remedy, regardless of the agency's agreement to provide an administrative forum (despite a lack of legislative authority to do so), and despite the possibility that Dairylea acted as a handler in some of the transactions at issue here.

There are, furthermore, practical considerations which seem to make determination at this stage desirable. It is clear that Dairylea members proceeding individually could seek an adjudication of the issue at the district court level. Their intervention in this case was precluded only by venue problems (see Tr. p. 83). It is, therefore, reasonable to assume that a finding of no jurisdiction here will lead not to an administrative review (which, in view of the complexities of milk price regulation, might be helpful) but to judicial review in another district. A refusal to adjudicate the issue here would then serve to further delay resolution of the issue without providing the counterbalancing benefit of an expert tribunal.

## II

"The power of the District Court in reviewing the decision of the Secretary, following his adjudicatory hearing, is not a *de novo* fact finding process. It is limited to a determination whether the rulings of the Secretary are in accordance with law and his findings are supported by substantial evidence. If they are, they may not be disturbed. Because there attaches to the determination of an administrative agency a presumption of the existence of facts justifying the determination, the burden of proof falls on the party challenging the validity of the agency's ruling." Lewes Dairy, Inc. v. Freeman, 401 F.2d 308, 315–316 (3rd Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed. 2d 455 (1969).

This rule is equally applicable in reviewing an agency promulgation following a rule-making hearing.

7 U.S.C. § 608c(5)(B)(ii)(d) allows the Secretary to adjust prices paid to producers:

> " . . . to encourage seasonal adjustments in the production of milk through equitable apportionment of the total value of the milk purchased by any handler, or by all handlers, among producers on the basis of their marketings of milk during a representative period of time, which need not be limited to one year."

This adjustment is made in Order 4 by allocating to each producer a base equal to his Order 4 marketings between August and December and giving it reduced payments for any deliveries made during the following flush season which exceed the base amount. Producers who enter the market during the flush season are not assigned reduced rates for all of the milk which they sell in Order 4, but

are given a fixed base which varies from 50% to 70%, depending upon the time of entry into the market. Established Order 4 producers have the option of choosing between the fixed percentage base and a base determined by their production record during the base-making months.

The Act provides that, after notice and hearing,

"the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this chapter with respect to such commodity." 7 U.S.C. § 608c(4).

Section 602(4) states the following policy:

"Through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for any agricultural commodity enumerated in section 608c(2) of this title as will provide, in the interests of producers and consumers, an orderly flow of the supply thereof to market throughout its normal marketing season to avoid unreasonable fluctuations in supplies and prices."

The contested provisions of Order 4 were based upon the following findings:[1]

"(d) *Seasonal incentive payment plan.* The merged order should provide for the payment of producers under a 'base and excess' plan as a means of encouraging a continuing uniform level of production throughout the year.

"Each of the respective orders presently provides a base-excess payment plan whereby bases are computed on deliveries in the months of July through December and are applicable for the months of March through June, except Washington, D.C., under which bases are applicable only for the three months of April through June. Each of the orders provides very liberal base transfer rules and, in addition, dairy farmers delivering milk to any plant which first enters the market after the beginning of any base-forming period may acquire bases computed as though such plant had been a pool plant throughout the base-forming period.

"Because of the ease with which transfers can be accomplished under the current orders and because dairy farmers can earn full bases, even though the plant to which their milk is delivered is pooled as little as a single month, there has been considerable abuse of the base-excess plan, particularly under the Delaware Valley order.

"Plants normally associated with the New York-New Jersey market (Order 2), and even the Massachusetts-Rhode Island-New Hampshire market (Order 1), have shifted regulation to the Delaware Valley order (in some instances for a single month) for the obvious purpose of acquiring bases for the dairy farmer patrons. Bases so acquired are then transferred to other producers in the Delaware Valley market. In other circumstances, deliveries from farms have been split so that only base milk is delivered to the Delaware Valley market, and what would otherwise have been excess milk is delivered as producer milk under another order. In still other circumstances, plants have shifted regulation to the Delaware Valley order during the base-operating period, which is the 'take out' period under Order 2, and have then been returned to regulation under Order 2 to participate in the 'pay back' under the Louisville plan during the fall months.

"These numerous abuses of the base plan, which in many situations were also abuses of the Louisville plan under either Order 1 or 2, have resulted in considerable discontent on the part of many

---

1. Order 4 resulted from a merger of two prior regions.

producers in the Delaware Valley market.

"A proposal for a Louisville payment plan was made on behalf of the Dairymen's League Cooperative Association, Inc. (now Dairylea Cooperative, Inc.) and Northeast Dairy Cooperative Federation, Inc. Both of these organizations are major cooperatives under Order 2 and Dairylea also has substantial membership among Order 4 producers.

"Proponents' fundamental purpose in making this proposal was essentially identical with that of proponents for a 12-month base plan; i. e., to encourage a continuing even pattern of production throughout the year and to eliminate interorder shifts to plants and producers for the sole purpose of exploiting the different seasonal pricing plans. In addition, however, proponents for a Louisville plan contended that such a plan was necessary to promote more uniformity of regulation and greater price equity among producers throughout the region.

"Both the base-excess plan and the Louisville seasonal incentive pricing plan obviously can be effective in promoting a desirable seasonality of production in any particular market. Although both plans have wide acceptance, the plan provided in any particular market should be one which has the approval of a substantial majority of producers in such market. The cooperatives representing such a majority of the producers in the markets here being merged support a base-excess plan.

"A 12-month base plan, with transfers limited to circumstances of death or discontinuance of the dairy enterprise, and with provision whereby new producers may acquire bases reflecting an equitable percentage of their monthly deliveries, was proposed by Pennmarva as the most appropriate means of insuring continuing even production.

"The base and excess plan herein adopted would establish a base for each producer by dividing his total deliveries to pool plants in the preceding months of August through December by 153

(154 in the case of a producer on every-other-day delivery and who delivered on August 1) less the number of days, if any, for which such producer's production was not received by pool handlers, but under no circumstances by less than 120. Producers would establish new bases each year. Such bases would be computed by the market administrator to be effective for the 12-month period of March 1 through February of the following year. By February 25 of each year the market administrator would notify each cooperative association with respect to the established base of each producer member and each nonmember producer with respect to his established base.

"Normally, new supply plants would be expected to enter the market only because additional milk supplies are required. Thus, there could be no need for such plants to enter the market initially in the months of flush production. Appropriately, dairy farmers associated with any supply plant entering the market should acquire bases in the identical manner as regular producers, i. e., based on their deliveries to pool plants during the base-forming months or in the alternative acquire a base in the manner hereinafter prescribed for new producers." 35 F.R. 7936, 7937 (May 22, 1970)

■ The Secretary's finding that selective interorder shipments had a disruptive effect upon efforts to achieve uniform production within Order 4 was supported by the Record (see, e. g., T. 717, 1233, and 1388–'89) and by marketing history in other regions.

In Zuber v. Allen, 396 U.S. 168, 90 S. Ct. 314, 24 L.Ed.2d 345 (1969) the Supreme Court struck down a locality differential which it found to be unsupported by findings that inhibition of the importation of outside milk was essential to market stability, holding that market differentials were only permissible

"[to] compensate or reward the producer for providing an economic serv-

ice of benefit to the handler." *Id.*, at 184, 90 S.Ct. at 323.

In Lehigh Valley Cooperative Farmers, Inc. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962), the Court struck down a system of "compensatory payments" for milk brought in by outside handlers as placing "almost insuperable trade restrictions on the entry of nonpool milk into a marketing area." It did not, however, reach the question of whether full regulation of outside handlers would be permissible under the Act. The differentials dealt with in those cases were, however, based upon that portion of the statute which provides that payments to producers shall be uniform, subject to adjustments for

"(c) the locations at which delivery of such milk is made." § 608c(5)(B)(ii)(c).

The requirement of "economic service" which was imposed by the Court is understandable in this context.

The authorization for the base-excess plan is of a different character. In providing that the Secretary might apportion the proceeds of milk sales on the basis of a producer's marketings during a representative period, the legislature authorized the Secretary to impose a price differential in a prescribed manner and for a prescribed purpose. Since there is an economic incentive for producers to shift among the various regions to take advantage of varying "pay-out" periods, it is clear that seasonal flow within a region cannot be effectively regulated unless the Secretary has the authority to lessen that incentive. Since the historic context precludes the assumption that Congress contemplated a uniform national system, it is safe to assume that it did not intend, as plaintiffs argue, that producers be given credit in a region operating under the base-excess plan for milk marketed outside that region during the base-making period.

■ Absolute equality among producers is not required by Section 608c(5)(G) or by constitutional principles. In Lewes Dairy, Inc. v. Freeman, *supra*, the Third Circuit upheld a provision which imposed full regulation upon a handler who did business outside the marketing area, thus placing him at a competitive disadvantage vis-a-vis unregulated, outside handlers. The court noted that full regulation of the handler was necessary in order to prevent an "open end" in the regulatory scheme (which is analogous to the "open end" of inter-order shifts which threatens attempts to achieve uniform year-round production):

". . . unless all of the milk received in such a plant was subject to full regulation the marketing order could be rendered ineffective because 'open ends' would be left whereby the handler could pay a lower price for milk sold outside the market, reducing the average cost of the handler's total milk supply . . ." (401 F.2d at p. 318).

The *Lewes* court also relied upon the plaintiff's failure to prove, rather than merely assert, that it suffered a competitive disadvantage or that the order created a trade barrier.

In Sunny Hill Farms Dairy Co., Inc. v. Hardin, 446 F.2d 1124 (8th Cir. 1971), cert. denied, 405 U.S. 1022, 92 S.Ct. 940, 30 L.Ed.2d 786 (1972), the court upheld a location differential, which it found to be supported by the administrative record and in accordance with the purposes of the Act, saying, at page 1131:

"The order does make it less profitable for Sunny Hill to sell in the St. Louis market than it would be were Sunny Hill not required to pay its producers the fifteen-cent differential. But the differential is specifically authorized by the Act and reasonable under the circumstances of the case. It thus cannot be construed as establishing an illegal trade barrier."

It has been said that

"The requirement of substantial evidence supporting salient findings is particularly important . . . where

the Secretary has chosen a broad rather than refined remedy as a means of solving the alleged problem. . . ." Fairmont Foods Co. v. Hardin, 143 U.S.App.D.C. 40, 442 F.2d 762, 771 (1971).

In this case, the Secretary has eased the burden of base-making provisions by giving producers who have low bases, or no base at all, a substantial percentage base. This provision takes the order out of the realm of the "almost insuperable trade restriction" described by the Supreme Court in the *Lehigh Valley* case.

### III

■ With regard to distributing plants, the Secretary made the following findings and conclusion:

"For distributing plants, the situation is somewhat different. A change in the respective volumes of Class I route sales between markets, either by virtue of additional business or by loss of sales, can result in an unintentional shift in regulation of a plant from one order to another. It would be unreasonable, in establishing bases, to discriminate against producers delivering to such a plant. Accordingly, the order provides that when a distributing plant first becomes regulated, the market administrator shall compute bases for the producers shipping to such plant on the identical basis used in the computation of bases generally, considering the deliveries of such producers to the plant in its non-pool status as though it had been a pool plant." 35 F.R. 7937 (May 22, 1970).

Plaintiff contends that this discrimination between "supply" and "distributing" plants is unreasonable. Neither side has made a very convincing record or argument on this point, but it does appear that distributing plants, which deal in Class I route sales, are less likely to engage in the seasonal shifts which the order seeks to regulate. Furthermore, in the event of a decision upholding the balance of the scheme, the requirement of a change in the treatment of distributing plants would be of no value to plaintiff.

For all the foregoing reasons the court is persuaded that the complaint must be dismissed.

The foregoing constitutes the court's findings of fact and conclusions of law.

So ordered.