**BERGEN COUNTY UTILITIES AUTHORITY, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, New Jersey Department of Environmental Protection and Hackensack Meadowlands Development Commission, Defendants.**

**Civ. No. 80–1396.**

United States District Court,
D. New Jersey.

Feb. 10, 1981.

Stephen J. Moses, Hackensack, N. J., for plaintiff.

Elizabeth Yu, Dept. of Justice, Washington, D. C., and Valerie Mauceri, Asst. U. S. Atty., Newark, N. J., for defendant United States Environmental Protection Agency.

Steven R. Gray and Mary C. Jacobson, Deputy Attys. Gen., Trenton, N. J., for defendants New Jersey Department of Environmental Protection and Hackensack Meadowlands Development Commission.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

In these times, government has no greater responsibility than to protect the environment, and to do so in such a manner that neither the method nor the site will prove to be hazardous in the years to come. We cannot permit any more toxic time bombs or legacies of poison.

Cases involving the resolution of environmental problems frequently follow the slow and arduous path of this litigation. Having recognized the need to prohibit or control sewage and toxic wastes, local government supports the solution so long as it is far distant. It is understandable that no community wishes a sewage treatment plant or toxic waste dump within its borders. But if we are to solve the problems of pollution, locations must be found. Certainly they should be in areas of the least impact, but they must be somewhere!

No party to this action challenges the ultimate goal of terminating ocean dumping. As in all such matters, however, governmental agencies wring their hands over the problem and then suggest that the solution or that which impedes it lies elsewhere. The extension of the present deadline will do nothing more than prolong the time for local action. The problem will remain; the alternatives are known; the possible locations ascertained.

All that remains is the necessary initiative and resolve to meet and solve the problem. The present deadline provides the impetus; an extension will dissipate it. Whatever bureaucratic wrangling would occur one year hence, may as well occur now. Plaintiff's claim that someone (other than itself) is responsible for the delays neither justifies nor necessitates their continuance.

It may be that despite the efforts of all those concerned, no facility will be in place in the immediate future. Permits for continued dumping may be a practical necessity. But the EPA must retain the leverage necessary to combat local apathy and provincialism. Local self-interest may have to give way to the common good. All of those in authority must utilize their best *and immediate* efforts toward that end.

## I. *FACTUAL BACKGROUND*

The following facts are undisputed. The plaintiff in this action, the Bergen County Utilities Authority ("BCUA"), was organ-

ized under N.J.Stat.Ann. § 40:14B–1 *et. seq.* (West Supp.1980) and charged with the disposal of sewage from 43 Bergen County municipalities. The defendant, United States Environmental Protection Agency ("EPA"), is a federal agency created pursuant to 5 U.S.C. § 901 *et. seq.* (1977).[1]

BCUA commenced this action on May 15, 1980, seeking a writ of mandamus ordering EPA to issue to it an ocean-dumping permit valid through December 31, 1981, and seeking to enjoin enforcement against it of the Marine Protection, Research, and Sanctuaries Act ("MPRSA"), 33 U.S.C. § 1401 *et. seq.* (1978), until completion of state litigation between BCUA and the Hackensack Meadowlands Development Commission ("HMDC").[2] The within complaint raises the issues of whether the denial by EPA of plaintiff's application for an ocean-dumping permit was arbitrary and capricious and whether it is appropriate for this court to issue a writ of mandamus ordering EPA to issue an ocean-dumping permit to BCUA. Cross-motions have been filed for summary judgment. Jurisdiction is based upon 28 U.S.C. § 1331 and the federal mandamus statute, 28 U.S.C. § 1361.

BCUA owns 130 acres of land in Little Ferry, New Jersey, which was obtained through condemnation in 1949 pursuant to N.J.Stat.Ann. § 40:14B–20(5) (West Supp. 1980).[3] This site was selected to serve as a sewage treatment plant and to allow for future expansion of such a facility. The agency presently treats raw sewage at the Little Ferry plant erected at said location. The sludge derived therefrom is dumped into the Atlantic Ocean.

A growing awareness of the immediate and severe dangers inherent in so disposing of waste led to the adoption in 1972 of the MPRSA and subsequently to promulgation of regulations by EPA pursuant to that Act. *See* S.Rep.No.92–451, 92d Cong., 1st Sess. 11–12 (1971), *reprinted in* [1972] U.S. Code Cong. & Adm.News at 4235–36. In enacting the landmark legislation Congress recognized that the millions of tons of waste and toxic materials dumped into the ocean each year can produce untold harm to natural and human life. *Id.* at 4238. The Senate Report quoted the findings of the Council on Environmental Quality's 1970 report to the President:

> Ocean-dumped wastes are heavily concentrated and contain materials that have a number of adverse effects. Many are toxic to human and marine life, deplete oxygen necessary to maintain the marine ecosystem, reduce population of fish and other economic resources, and damage aesthetic values . . . .

> The Council's study indicates that the volume of waste material dumped in the oceans is growing rapidly because the capacity of land-based waste disposal sites is becoming exhausted in some coastal cities. Communities are looking to the oceans as a dumping ground for their wastes. Faced with higher water quality standards, industries may also look to the oceans for disposal. The result could be a massive increase in the already growing level of ocean dumping. If this occurs, environmental deterioration will become widespread.

1. The complaint has been amended to add the Hackensack Meadowlands Development Commission ("HMDC") and the New Jersey Department of Environmental Protection ("DEP") on related claims.

2. The litigation in state court is no longer pending, rendering moot the issue of whether a preliminary injunction should be granted.

3. N.J.Stat.Ann. § 40:14B–20(5) provides in pertinent part:
   Every municipal authority shall have the following powers:

(5) In the name of the municipal authority but for the local unit or units and subject to the limitations of this act, to acquire by purchase, gift, condemnation or otherwise, or lease as lessee, real property and easements therein, necessary or useful and convenient for the purposes of the municipal authority, and subject to mortgages, deeds of trusts or other liens, or otherwise, and to hold and to use the same, and to dispose of property so acquired no longer necessary for the purposes of the municipal authority.

Current regulatory activities and authorities are not adequate to handle the problems of ocean dumping.

*Id.* at 4237–38.

The Act adopted in response to these concerns prohibits transportation of any material from the United States for the purpose of dumping into the ocean. 33 U.S.C. § 1411(a)(1) (1978). Congress, however, provided for exceptions to the prohibition through a permit program to be administered by the EPA. 33 U.S.C. §§ 1412–13 (1978). The Administrator of the EPA must establish and apply criteria for the evaluation of permit applications, 33 U.S.C. § 1412(a) (1978),[4] and may issue such regulations as he deems appropriate. 33 U.S.C. § 1418 (1978).

Pursuant to its regulatory authority under the statute, the EPA established environmental impact criteria to be used in reviewing permit applications. 40 C.F.R. § 227 (1980). The EPA created several categories of permits on the basis of the degree of adverse environmental impact, the need for dumping, the availability of alternatives to ocean dumping, and the effect on aesthetic, recreational, and economic values and uses of the ocean. 40 C.F.R. § 220.3 (1980). Where the sludge does not satisfy the environmental impact criteria, but the applicant can show a need to dump and a lack of alternatives, the regulations authorize issuance of an interim permit for no more than one year. To obtain such a permit, however, the applicant must show that it has exercised its best efforts to comply with the criteria and that it has an implementation schedule adequate to allow phasing out of ocean dumping or compliance with the criteria no later than December 31, 1981. 40 C.F.R. § 220.3(d) (1980).[5]

In addition to the EPA's regulations mandating compliance with the criteria or elimination of dumping by December 31, 1981, Congress enacted an amendment to the MPRSA prohibiting the issuance or renewal of any ocean-dumping permit that would permit dumping beyond that date. 33 U.S.C. § 1412a(a) (1978).[6] The need to

---

4. The Administrator is directed to consider the following factors, among others, in establishing and applying criteria for reviewing and evaluating permit applications:

(A) The need for the proposed dumping.

(B) The effect of such dumping on human health and welfare, including economic, esthetic, and recreational values.

(C) The effect of such dumping on fisheries resources, plankton, fish, shellfish, wildlife, shore lines and beaches.

(D) The effect of such dumping on marine ecosystems, particularly with respect to—

(i) the transfer, concentration, and dispersion of such material and its byproducts through biological, physical, and chemical processes,

(ii) potential changes in marine ecosystem diversity, productivity, and stability, and

(iii) species and community population dynamics.

(E) The persistence and permanence of the effects of the dumping.

(F) The effect of dumping particular volumes and concentrations of such materials.

(G) Appropriate locations and methods of disposal or recycling, including land-based alternatives and the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest.

(H) The effect on alternate uses of oceans, such as scientific study, fishing, and other living resource exploitation, and nonliving resource exploitation.
33 U.S.C. § 1412(a) (1978).

5. [I]nterim permits may be issued . . . to dump materials which are not in compliance with the environmental impact criteria . . . or which would cause substantial adverse effects as determined in accordance with the criteria . . . provided . . . that the compliance date of April 23, 1978, does not apply to dumping of wastes by existing dumpers when the Regional Administrator determines that the permittee has exercised his best efforts to comply with all requirements of a special permit by April 23, 1978, and has an implementation schedule adequate to allow phasing out of ocean dumping or compliance with all requirements necessary to receive a special permit by December 31, 1981 at the latest.
40 C.F.R. § 220.3(d) (1980).

6. The Administrator of the Environmental Protection Agency (hereinafter referred to in this section as the "Administrator") shall end the dumping of sewage sludge into ocean waters, or into waters described in section 1411(b) of this title, as soon as possible after November 4, 1977, but in no case may the Administrator issue any permit, or any renewal thereof (under Title I of the Marine Protection, Research, and Sanctuaries Act of 1972) which authorizes any such dumping after December 31, 1981.
33 U.S.C. § 1412a(a) (1978).

amend the statute in this manner underscores Congressional dissatisfaction with the EPA's progress in phasing out ocean dumping.[7]

On July 6, 1979, BCUA applied for a renewal of its interim ocean-dumping permit for the year 1980. At a public hearing on the application, it was determined that BCUA's sewage sludge did not meet the environmental impact criteria. Additionally, because of conflict with HMDC over site selection for BCUA's sludge management facility, BCUA was unable to meet its implementation schedule and, therefore, failed to establish a schedule that would lead to a phase-out of ocean dumping or compliance with the criteria by the statutory and regulatory deadline of December 31, 1981. Although EPA's Regional Hearing Officer recommended approval of the application, the Acting Regional Administrator determined that the regulations required its denial. BCUA was allowed to continue dumping under its old permit pending an application requesting an adjudicatory hearing. That application was denied on April 8, 1980, and BCUA subsequently commenced the present litigation.

On May 15, 1980, this court issued a consent order temporarily restraining the EPA from enforcing the provisions of the MPRSA, while BCUA negotiated with HMDC and DEP. Additional consent orders extended the dates of the restraints to December 31, 1980, but the EPA refused to grant any further extensions.

## CONCLUSIONS OF LAW

Plaintiff contends that the foregoing action of defendant EPA was arbitrary, capricious and unreasonable, and that this court through the issuance of a writ of mandamus should compel the EPA to grant the subject permit. The EPA denies plaintiff's contention that it acted arbitrarily, capriciously, and unreasonably when it refused to issue plaintiff an ocean-dumping permit,

and maintains that it would be improper to issue a writ of mandamus ordering the EPA to grant an ocean-dumping permit to BCUA.

■ The standard of judicial review of agency action is whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1972); *Ramapo Bank v. Camp*, 425 F.2d 333, 347 (3d Cir.) *cert. denied*, 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970); *Borden Co. v. Freeman*, 256 F.Supp. 592, 602 (D.N.J.1966), *cert. denied*, 386 U.S. 992, 87 S.Ct. 1307, 18 L.Ed.2d 337 (1967). The scope of such judicial review is narrow. The court must not substitute its judgment for that of an agency authorized to exercise rulemaking functions in an area where the agency possesses a unique expertise. Instead the court must affirm the agency's decision, if there was a rational basis for it. *Bowman Transportation v. Arkansas-Best Freight System*, 419 U.S. 281, 285, 290, 95 S.Ct. 438, 441, 444, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Borden Co. v. Freeman*, 256 F.Supp. 592, 602 (D.N.J.1966), *cert. denied*, 386 U.S. 992, 87 S.Ct. 1307, 18 L.Ed.2d 337 (1970); *Smith and Solomon Trucking Co. v. United States*, 255 F.Supp. 243, 249 (D.N.J.1966). Additionally, agency action is presumed to be valid and the plaintiff has a heavy burden of proof to rebut same. *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308, 315–16 (3d Cir. 1968), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969); *Crowther v. Seaborg*, 312 F.Supp. 1205, 1234–35 (D.Colo.1970); *Smith and Solomon Trucking Co. v. United States*, 255 F.Supp. 243, 249 (D.N.J.1966).

■ In the present case, the EPA's denial of an ocean-dumping permit was neither arbitrary nor capricious. On the contrary, such was the only decision consistent with

---

7. Although aware of the EPA deadline, some congressmen indicated concern as to EPA's ability to obtain compliance with it. *See, e. g.,* 123 Cong.Rec. § 17420–21 (daily ed., Oct. 20, 1977).

the regulation that a permit could issue only to applicants who have an implementation schedule enabling them either to meet the environmental impact criteria or to phase out ocean dumping by December 31, 1981.

BCUA did not establish such a schedule. An agency regulation has the full force and effect of law, *Lichter v. United States*, 334 U.S. 742, 785, 68 S.Ct. 1294, 1316, 92 L.Ed. 1694 (1947); *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3, 8 (3d Cir. 1964), and, therefore, the EPA was bound by the regulation and could not issue a permit which would violate it. *Bethlehem Steel Corp. v. Train*, 544 F.2d 657 (3d Cir. 1976), *cert. denied*, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977).

BCUA contends that it made every effort to comply with the necessary requirements, but that such compliance was frustrated and thwarted by actions or inaction by the HMDC and DEP. The court recognizes the highly sensitive and sometimes emotional issues presented by the establishment of such facilities in populated areas. But if the legislative purpose can be thwarted by an assertion of local bureaucratic differences, then the ocean will soon meet the same fate as many of our streams and rivers. Pointing the proverbial finger elsewhere cannot excuse performance. If such interference does exist, granting the relief plaintiff seeks will only prolong it.

Since it would not be appropriate for the EPA to issue a permit to plaintiff, it would be improper for this court to issue a writ of mandamus ordering the EPA to issue such permit. Mandamus lies only where there is a clearly prescribed duty to do an act of a ministerial nature by the agency or officer against whom the remedy is sought. *Short v. Murphy*, 512 F.2d 374, 377 (6th Cir. 1975); *Richardson v. United States*, 465 F.2d 844, 849 (3d Cir. 1972); *United States v. Walker*, 409 F.2d 477, 481 (9th Cir. 1969); *Prairie Band of Pottawatomie Tribe of Indians v. Udall*, 355 F.2d 364, 369 (10th Cir. 1966). The EPA has no clearly prescribed duty to issue BCUA an ocean-dumping permit. On the contrary, direct-ing the EPA to issue such a permit would require it to disobey legally promulgated regulations which prohibit issuing a permit under these circumstances.

In accordance with the foregoing principles of law, and because there are no material issues of fact in this case, the EPA's motion for summary judgment is granted, and the motion for summary judgment of BCUA is denied.